A.S., Appellant,

v.

T.H., Appellee.

No. 79A05–0908–CV–463.

Court of Appeals of Indiana.

Feb. 8, 2010.

Thomas N. Logan, Withered Burns & Persin, LLP, Lafayette, IN, Attorney for Appellant.

**OPINION**

DARDEN, Judge.

### STATEMENT OF THE CASE

A.S. appeals the trial court's order of protection against her pursuant to a petition filed by T. H.

We affirm.

### ISSUE

Whether sufficient evidence supports the order.

### FACTS

On June 23, 2009, T.H. filed a petition for an order of protection against A.S. and a request for a hearing. Under the penalty of perjury, his petition asserted that he had been the victim of stalking and of domestic violence; that he and sixteen-year old A.S. had been dating and had been intimate; and that she had attempted to cause physical harm to him and committed stalking against him. His petition specified three incidents: her assault and battery on him on May 27, 2009; repeatedly driving past his home and yelling obscenities at his parents on June 6, 2009; and calling his residence eight times in six minutes on June 21, 2009. He asked that an order of protection be entered against A.S. with respect to himself, his mother, his stepfather, and his stepsister.

On June 30, 2009, an ex parte hearing was held. T.H. testified that A.S. was his former girlfriend, with whom he had been intimate. He testified that on May 27th, she had struck him in the mouth with her open hand, and tried to knee him in the groin. He further testified that on June 6th, she had driven by his house several times, yelling obscenities at his parents, who were in the yard outside, and had put his sweatshirt in the mailbox. T.H.'s stepfather testified that the shirt she put in the mailbox had been defaced, with obscenities written with a permanent marker. T.H. testified that on June 21st, A.S. called the family residence eight times in six minutes, and his stepfather testified that A.S. "said on the phone, ... I am not going to quit.... I'm not going to quit doing this...." (App.9). T.H. testified that the phone line was "disconnected ... in order to stop the phone calls" from her. (App.8). When the trial court explained "stalking," in the context of an order for protection, T.H. stated that he had felt "intimidated." (App.10). The trial court declared that it would sign the protective order, and emphasized that its goal was "to keep the peace." *Id.*

The ex parte protective order issued June 30, 2009 states that T.H. had shown by a preponderance of the evidence that domestic violence or stalking had occurred; A.S. represented a credible threat to his safety or that of members of his household; and that the protective order was necessary. The order enjoined A.S. from threatening to commit or committing acts of domestic violence or stalking against T.H., his mother, his stepfather, and his stepsister. (App.40). It prohibited her from harassing T.H. and ordered her to stay away from his residence (and school, and place of employment).

On July 10, 2009, A.S. filed a request for a hearing. On July 16, 2009, the trial court heard testimony by A.S. She admitted that she slapped T.H., and that she "attempted to" hit him again "but [she] was pulled away" by others. (App.22). She admitted driving past T.H.'s residence several times and yelling when his parents were in the yard, but insisted she "never said anything rude." App. 24. She admitted that she damaged T.H.'s sweatshirt by writing "a lot of obscene things" on it with a permanent marker. (App.25). When asked whether she called T.H.'s residence "several times on June the 21st," she did not deny making the calls. When specifically asked if she "did ... in fact call eight (8) times in a period of about six (6) minutes," she answered, "Yes." (App.26).

Counsel for A.S. argued that her single physical attack was an isolated incident, and "these things in total" were not "a credible threat to the safety of Mr. T. H." (App.28). Counsel further argued that T.H.'s petition was insufficient to "invoke the protection" of the others named in the order; the trial court indicated these were "members of [T.H.'s] household," according to "testimony ... heard before." (App.29). The trial court then held that "the ex parte order of protection shall remain in effect until June 30, 2011." (App.30).

### DECISION

■ Initially, we note that T.H. did not file an appellee's brief. When the appellee fails to submit a brief, we need not undertake the burden of developing an argument on the appellee's behalf. *Trinity Homes, LLC v. Fang*, 848 N.E.2d 1065, 1068 (Ind.2006). Rather, we will reverse the trial court's judgment if the appellant's brief presents a case of prima facie error. *Id.* Prima facie error in this context is defined as "at first sight, on first appearance, on the face of it." *Id.* (citation omit-

ted). When the appellant is unable to meet this burden, we will affirm. *Id.*

■ Indiana's legislature has directed the courts to "construe" the Civil Protection Order Act ("the Act") so as "to promote the (1) protection and safety of all victims of domestic or family violence in a fair, prompt, and effective manner; and (2) prevention of future domestic and family violence." Ind.Code § 34–26–5–1. The Act authorizes "a person who is or has been a victim of domestic ... violence" to file a petition for an order for protection. I.C. § 34–26–5–2. The respondent in such an action may be a person with whom the petitioner had been in a dating or sexual relationship. *See* I.C. § 34–6–2–44.8(2), (3). The petition for protection may be sought against a respondent who has committed (1) an act of domestic violence against the petitioner, or (2) "stalking," as defined in the criminal code. I.C. § 34–26–5–2. Further, "domestic violence" means "the occurrence of" an act by the respondent "attempting to cause, threatening to cause, or causing physical harm" to the petitioner, or placing the petitioner "in fear of physical harm." I.C. § 34–6–2–34.5. Pursuant to the Act, "domestic violence ... includes stalking (as defined in IC 35–45–10–1)." *Id.* The relevant definition of "stalking" is as follows:

> a knowing or intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened.

I.C. § 35–45–10–1. Upon a showing of domestic violence "by a preponderance of the evidence, the trial court 'shall grant the relief necessary to bring about a cessation of the violence or the threat of violence.'" *Moore v. Moore,* 904 N.E.2d 353,

358 (Ind.Ct.App.2009) (quoting I.C. § 34–26–5–9(4)).

■ To obtain an order of protection under the Act, the petitioner must establish by a preponderance of the evidence at least one of the allegations in the petition. *Tons v. Bley,* 815 N.E.2d 508, 511 (Ind.Ct. App.2004). In determining the sufficiency of the evidence on appeal, we neither weigh the evidence nor resolve questions of credibility. *Id.* We look only to the evidence of probative value and reasonable inferences that support the trial court's judgment. *Id.*

A.S. argues that the evidence is insufficient to support either the allegation of domestic violence or of stalking. She first argues that the evidence is insufficient to show that she "is a credible threat to the safety of T.H." or his family, reminding us that under the Act, a finding that domestic violence has occurred sufficient to justify the issuance of an order "means that a respondent represents a credible threat to the safety of a petitioner or a member of a petitioner's household." A.S.'s Br. at 9 (quoting I.C. § 34–26–5–9(f)). A.S. further argues that the evidence is insufficient to establish that she committed "an act of stalking against T.H. or any other member of his family." A.S.'s Br. at 13. In this regard, she notes that according to the Act, the stalking conduct must be either repeated or continuing, and here there was "a single act of physical contact," and the incidents in this case "do not amount to an act of stalking since no reasonable person would feel terrorized, frightened, intimidated, or threatened" by her. *Id.* at 14.

■ We first consider the sufficiency of the evidence supporting the order of protection as to T.H. A.S. cites to *Garmene v. LeMasters,* 743 N.E.2d 782 (Ind.Ct.App. 2001); *Tons v. Bley,* 815 N.E.2d 508 (Ind. Ct.App.2004); and *Aiken v. Stanley,* 816 N.E.2d 427 (Ind.Ct.App.2004), emphasizes the single incident of actual physical con-

tact, and asserts that her case "is factually different from each." T.H.'s Br. at 12. Given the facts presented to the trial court here and our standard of review, however, we do not find the factual differences to be dispositive.

Although A.S. only struck T.H. once and attempted to knee him in the groin, her own testimony established that she would have stricken him multiple times had not witnesses "pulled [her] away." (App.22). Hence, there was evidence of both her "causing physical harm" to T.H. and "attempting to cause ... physical harm" to him. I.C. § 34-6-2-34.5. This is sufficient evidence to support a finding that she represented "a credible threat" to his safety. I.C. § 34-26-5-9(f). In addition, the evidence established that subsequent to this attack, A.S. yelled obscenities while repeatedly driving past his residence, returned an item of his clothing which she had destroyed by writing obscenities on it, and called his residence eight times within six minutes, and indicated that she was not going to stop, i.e., repeated acts of harassment. Further, T.H. testified that her acts made him feel intimidated. Thus, there was sufficient evidence to support the trial court's conclusion that A.S. committed domestic violence and stalking as to T.H.

■ We now turn to her argument that the evidence is insufficient to sustain the finding that she committed either domestic violence or stalking as to his family members. A.S. asserts that the facts here "resemble *Tons*" insofar as both trial courts "issued orders for protection in favor of persons for which no evidence was tendered that showed the person to be restrained made any threats of violence or committed any acts of violence against these persons." A.S.'s Br. at 12. We disagree.

In *Tons*, an order for protection was issued against Tons and in favor of (1) his thirteen-year-old son, Travis, of whom Tons shared legal custody with his former wife, (2) Barbara Bley—Travis' mother and Tons' former wife, and (3) Brian Bley (Barbara's husband, and Travis' stepfather). Our opinion noted Tons' threats to beat Travis, and evidence that he "had physically struck Travis in November of 2002 and on other occasions." 815 N.E.2d at 510. Tons' appeal did not challenge the protective order "as it applie[d] to Travis," but rather argued that there was insufficient evidence presented to warrant "a protective order as to" Barbara and Brian. *Id.* at 511, 510. We noted Barbara's testimony "that Tons had not threatened her," and that there was "no evidence of any threats or acts of violence against Brian Bley." *Id.* at 510. Acknowledging Barbara's testimony of "some violence towards her by Tons during their marriage," which ended in 1996, we found "that unspecified acts of violence occurring eight years previously" were "not a sufficient basis for the issuance of a protective order." *Id.* at 510, 511. Accordingly, we reversed the protective order as to both Barbara and Brian.

The critical factual distinction between *Tons* and the case at bar is that in *Tons*, there was no evidence that Tons' threats to beat Travis were connected to his residence with Barbara and Brian. Nor was there evidence of a pattern of threatening acts connected to the residence of the Bley household. Here, following an initial actual act of physical violence to T.H. and her admitted attempt to inflict additional physical violence, A.S. engaged in multiple acts directed toward T.H.'s household—acts that could reasonably be inferred, under the circumstances, to constitute threats to the household. A.S. admitted she repeatedly drove past T.H.'s family's residence, and the trial court heard testimony that she yelled obscenities as she did so and that T.H.'s mother and stepfather were outside in the yard and heard her. A.S. also admitted destroying a sweatshirt

**808**

that belonged to T.H. by writing obscenities on it and placing in the family's mailbox. Further, A.S. admitted calling T.H.'s residence eight times within six minutes, and she expressed her intention of continuing such calls. The verbal and written obscenities directed at T.H., with at least some actually heard by his family, and the multiple calls with threats of more to come, could reasonably be inferred to cause members of his household to feel terrorized.

We return to the legislature's stated purpose that the Act provide a mechanism for a protective order that promotes the protection and safety of all victims of domestic violence and prevents future domestic violence. *See* I.C. § 34–26–5–1. The Act authorizes an order of protection that would prohibit the respondent "from harassing, annoying, telephoning, contacting," or communicating with the petitioner, I.C. § 34–26–5–9(b)(2); to order the "relief necessary to provide for the safety and welfare of a petitioner and each designated family or household member," and "necessary to bring about a cessation of the violence or the threat of violence," as well as I.C. § 34–26–5–9(b)(2), (b)(6), and (f). Here, the trial court was presented with facts indicating physical violence by A.S. and a pattern of acts directed at harassing T.H.'s household. The trial court took action as authorized by statute in order to maintain the peace and to prevent the occurrence of any future domestic violence. We find sufficient evidence of probative value and reasonable inferences supports its issuance of the protective order. *Tons,* 815 N.E.2d at 511.

Affirmed.

KIRSCH, J., and MAY, J., concur.