Christopher A. ANDREWS,
Appellant–Respondent,

v.

Sara L. IVIE, Appellee–Petitioner.

No. 55A01–1103–PO–110.

Court of Appeals of Indiana.

Sept. 7, 2011.

Jerry E. Smith, Martinsville, IN, Attorney for Appellant.

Pamela Siddons, Mooresville, IN, Attorney for Appellee.

## OPINION

BARTEAU, Senior Judge.

### STATEMENT OF THE CASE

Respondent–Appellant Christopher A. Andrews appeals the trial court's issuance of a protective order in favor of Petitioner–Appellee Sara L. Ivie. We affirm.

### ISSUE

Andrews raises one issue, which we restate as: whether there was sufficient evidence to support the trial court's issuance of the protective order.

### FACTS AND PROCEDURAL HISTORY

Andrews and Ivie ended their relationship in December 2008. It was a "slow break-up." Tr. p. 16. On April 13, 2009, Ivie sent an email to Andrews asking him to stop contacting her after April 19, which was the date Andrews was to retrieve his remaining items from Ivie's residence. Despite her request, Andrews emailed her on April 20 and May 11, 14, 24, and 25. On May 25, Ivie informed Andrews again to stop contacting her. In June, Ivie received a card and letter from Andrews in her mailbox. She did not open it and instead marked "return to sender" on the envelope and put it back in her mailbox. She later found the same envelope in her mailbox opened. Andrews emailed Ivie again on July 4 and 13. On July 13, Ivie demanded yet again that Andrews stop contacting her.

In October or November, Andrews initiated a conversation with Ivie when he saw her walking with friends in Pioneer Park in Mooresville. They engaged in small talk for a few minutes before Ivie ended the conversation. On December 24, Andrews mailed Ivie DVDs of her favorite television series with no return address, no receipt, and no note.

In January 2010, Andrews sent Ivie text messages. She did not respond to any of them and began blocking Andrews's emails and paying her phone service to block his phone numbers. For Valentine's Day in February, Andrews sent Ivie DVDs of two more seasons of her favorite television series through Amazon.com. Ivie returned the package with a note requesting the company to stop shipping her items from Andrews. Nonetheless, in May, Ivie received a package from Amazon.com with a DVD and two CDs. In July, Ivie refused an Amazon.com package because she had not ordered anything and assumed it was another gift from Andrews. In November, Ivie received a Facebook message and an email message from Andrews. She blocked him from her Facebook account and re-blocked him from her email account.

On November 30, Ivie filed a petition for a protective order alleging that she was a victim of stalking. The trial court issued an ex parte protective order on December 1. On January 14, 2011, Andrews filed a request for a hearing.

The trial court held a hearing. Ivie testified that she believes she is a victim of stalking and that Andrews has continued

to send her emails, text messages, and gifts despite her repeated requests not to do so. She also testified that with her petition, she filed with the trial court sixty-four pages of emails she had received from Andrews. Ivie stated that Andrews's unwelcome contacts cause her to "suffer emotional distress." *Id.* at 5. She stated, "I get very angry. The relationship ended for a reason and to be constantly reminded of him is very upsetting. I live alone and so I find it disturbing that he's continuing to keep tabs on me even though I've asked him to leave me alone." *Id.* She was concerned that Andrews is twice her size and knows her routines and further stated:

> I think most disturbing to me is like I mentioned, I live alone. He knows where I live. He knows my dog. He's, when we were together, he was an avid gun collector so I know at the time at least he had many, many guns, knives, whatnot, just because he's a collector, so he has the means to hurt me if he so desired. He's been on and off antidepressants and there's evidence of that in the emails received from him so I don't know what his state of mind is. I'm not afraid of his rational mind but I'm very concerned about his irrational mind and how it might affect me.

*Id.* at 9–10. Ivie testified that Andrews stated in three separate emails that he had stopped taking his antidepressants. She "worr[ies] about the tone of his emails." *Id.* at 15. In one email, Andrews told Ivie how much he loves her and that "nobody would ever put [up] with [her] 'cause [she's] a bitchy little thing." *Id.* at 16. Ivie said that a few months before the relationship ended, "he had [her] cornered in the bedroom and wouldn't let [her] out" but that there was no abuse. *Id.* at 13. She stated that she felt "threatened" and that she believes Andrews is capable of doing it again. *Id.* at 17.

At the end of the hearing, the trial court stated:

> [T]his is the largest stack of emails, mail delivery, presents I've ever seen in a case in ten years of doing this and this says to me that, you know, maybe you're doing the nice thing and that's fine but unfortunately she says it's bothering her. She's, in multiple emails up here, told you to stop contacting her.

*Id.* at 26–27. The trial court found that Andrews's actions constituted stalking and issued a protective order in favor of Ivie. Andrews now appeals.

## DISCUSSION

Andrews contends that there is insufficient evidence to support the trial court's issuance of the protective order. In determining the sufficiency of the evidence on appeal, we neither weigh the evidence nor resolve questions of credibility. *A.S v. T.H.*, 920 N.E.2d 803, 806 (Ind. Ct.App.2010). We look only to the evidence of probative value and reasonable inferences that support the trial court's judgment. *Id.*

The Indiana Civil Protection Order Act ("CPOA") is to be construed to promote (1) the protection and safety of all victims of domestic or family violence in a fair, prompt, and effective manner and (2) the prevention of future domestic and family violence. Ind.Code § 34–26–5–1 (2002); *Moore v. Moore*, 904 N.E.2d 353, 357–58 (Ind.Ct.App.2009). Pursuant to the CPOA, a person who is or has been a victim of domestic or family violence may file a petition for a protective order against (1) a family or household member who commits an act of domestic or family violence or (2) a person who has committed stalking under Indiana Code section 35–45–10–5 (2002) or a sex offense under Indiana Code chapter 35–42–4 against the petitioner. Ind.Code § 34–26–5–2(a)

(2002); *Tisdial v. Young,* 925 N.E.2d 783, 785 (Ind.Ct.App.2010). The trial court may issue or modify a protective order only upon a finding "that domestic or family violence has occurred." Ind.Code § 34–26–5–9(a), (f) (2009); *Tisdial,* 925 N.E.2d at 785. For purposes of the CPOA, domestic and family violence also includes stalking as defined in Indiana Code section 35–45–10–1 (1993) or a sex offense under Indiana Code chapter 35–42–4, "whether or not the stalking or sex offense is committed by a family or household member." Ind.Code § 34–6–2–34.5 (2007); *Tisdial,* 925 N.E.2d at 785.

■ To obtain a protective order under the CPOA, the petitioner must establish by a preponderance of the evidence at least one of the allegations in the petition. *A.S.,* 920 N.E.2d at 806. A trial court generally has discretion to grant protective relief according to the terms of the CPOA. *Moore,* 904 N.E.2d at 358. However, a finding by the trial court that domestic or family violence has occurred sufficient to justify the issuance of an order for protection means that the respondent represents a credible threat to the safety of the petitioner. *Id.* Therefore, upon a showing of domestic or family violence by a preponderance of the evidence, the trial court shall grant relief necessary to bring about a cessation of the violence or the threat of violence. *Id.*

Ivie's protective order petition alleged that she was a victim of stalking, and the trial court found in its order that she was a victim of stalking. Stalking is defined as "a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened." Ind.Code § 35–45–10–1.

Harassment is defined as "conduct directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress." Ind.Code § 35–45–10–2 (1993).

■ The evidence most favorable to the trial court's judgment shows that despite Ivie's clear, repeated demands to leave her alone, Andrews continued to "keep tabs" on her. Tr. p. 5. When Ivie returned a card from Andrews, he placed it back in her mailbox. He sent her numerous emails, one in which he professed his love for her but also stated that "nobody would ever put [up] with [her] 'cause [she's] a bitchy little thing." *Id.* at 16. Andrews continued to text Ivie and sent her multiple gifts through the mail, including Christmas and Valentine's Day gifts. Ivie blocked Andrews's phone and email messages, but he still found ways to contact her. Ivie described Andrews's unwelcome contacts as "very upsetting" and "disturbing" and that they cause her "emotional distress" and make her "very angry." *Id.* at 5. She noted that Andrews is twice her size, is an avid collector of guns and knives, and knows her dog, her routines, and where she lives. Noting that some of his emails indicated that he had stopped taking his antidepressants, Ivie testified, "I'm very concerned about his irrational mind and how it might affect me." *Id.* at 10. Ivie also recalled an incident before the relationship ended where Andrews cornered her in the bedroom and would not let her out and testified that she had felt "threatened" and believes that Andrews is capable of doing it again. *Id.* at 17.

Despite this clear evidence, Andrews argues that he thought Ivie was "genuinely glad" to see him at the Mooresville park and thought "maybe she'[d] [gotten] over

some of her anger." *Id.* at 21, 21–22. He also argues that his conduct "would not have caused a reasonable person to feel terrorized, frightened, intimidated, or threatened and did not cause Ms. Ivie to feel that way." Appellant's Reply Br. p. 3. These are simply requests to reweigh the evidence, which we will not do.

Within his sufficiency argument, Andrews asserts that the trial court "clearly relie[d]" on the content of his email, text, and Facebook messages when issuing the protective order even though that content was not offered into evidence. Appellant's Br. p. 7. For support, he points to the trial court's statement, "[T]his is the largest stack of emails, mail delivery, presents I've ever seen in a case in ten years of doing this and this says to me that, you know, maybe you're doing the nice thing and that's fine but unfortunately she says it's bothering her." Tr. pp. 26–27. This statement, however, shows only that the court considered the extent of the contacts, not the content of Andrews's messages. He directs us to no specific content of any message to support his assertion that the trial court improperly relied on unoffered evidence. We further disagree with Andrews's alternate characterization of the trial court's ruling as being solely based on "the size of the stack of paper on his desk." Appellant's Reply Br. p. 6. The trial court also had before it Ivie's testimony regarding her clear demands that he leave her alone, some of the content of the messages, the numerous unwelcome gifts Andrews sent her, and the effect of all these contacts on her.

Andrews attempts to distinguish *Smith v. State,* 802 N.E.2d 948 (Ind.Ct.App.2004), where we concluded that there was sufficient evidence to sustain the defendant's stalking conviction. In *Smith,* the defendant was arrested for public intoxication. *Id.* at 950. He told one of the arresting officers that he would be " 'looking out for him with his 7.62,' referring to the ammunition used in an assault rifle." *Id.* (citation omitted). After the defendant was released on bond, he left the officer eight or nine voicemail messages. *Id.* The messages included obscenities and threats on the officer's life. *Id.* The officer feared for his safety and that of his family. *Id.* This Court held that telephone messages, without more, may amount to impermissible contact sufficient to support a stalking conviction. *Id.* at 954. In concluding that there was sufficient evidence to sustain the defendant's stalking conviction, we noted that the course of conduct the State must prove need not involve multiple threats but rather repeated or continuing harassment. *Id.*

Andrews asserts that while the defendant in *Smith* left "several phone messages in a short period of time and those messages included threats and obscenities," here, Andrews "generally sent gifts spaced more than a month apart and when he had used text messaging or emails, he did not leave threats or obscenities in his message[s]." Appellant's Br. p. 6. Andrews thus appears to make distinctions based on the frequency of his contact with Ivie and the content of his messages. First, the content of his messages is not included in the record on appeal other than the bits and pieces to which Ivie testified. We therefore have no way of knowing whether his messages did or did not include threats. Regardless, as noted by this Court in *Smith,* the course of conduct need not involve threats but rather repeated or continuing harassment that would cause a reasonable person and that did cause the victim to feel terrorized, frightened, intimidated, or threatened. 802 N.E.2d at 954. Assuming without deciding that Andrews's contacts did not involve threats, Ivie's testimony nonetheless

shows that his contacts caused Ivie to feel terrorized, frightened, intimidated, or threatened.

Second, we acknowledge that there were longer gaps of time between some of the contacts; for example, no evidence was presented that Andrews contacted Ivie between July 13, 2009, when Ivie demanded for the third time that Andrews leave her alone, and October or November of that same year, when Andrews initiated a conversation with her in the Mooresville park. Nonetheless, we have no reluctance in holding that Andrews's contacts with Ivie via gifts, emails, texts, and Facebook messages constituted repeated or continuing harassment sufficient to support a finding of stalking.[1]

Andrews also attempts to distinguish *Garza v. State*, 736 N.E.2d 323 (Ind.Ct. App.2000). In *Garza*, the defendant, who was the victim's supervisor, often complimented the victim's physical appearance, leaned in close to her, asked if she wanted to see a movie while they were at a training conference, and gave her a rose. *Id.* at 324. After the victim found another job, the defendant sent the victim a bouquet of flowers with an unsigned note, called her the next week at her new place of employment to ask whether she enjoyed the flowers, gave her roses for her birthday with a note reading, "HATE, ANGER, BITTERNESS, MALICE, VENOM, HELLISH PRISONS OF OUR OWN MAKING," joined her gym, watched her while she was working out, asked her to lunch, and followed her from the gym to the grocery store. *Id.* During this time, the victim declined his invitations, told him his behavior was inappropriate, stated that she did not appreciate the attention, and demanded that he stop. *Id.*

Andrews argues that unlike in *Garza*, he "rarely had any kind of contact" with Ivie. Appellant's Br. p. 7. He points out that in 2010, he sent her "two text messages in January, gifts through Amazon.com in February, May, and July, then nothing until November when he sent her a Facebook message and an email." *Id.* We fail to see how this conduct constitutes "rare" contact, particularly in light of Ivie's repeated demands that he leave her alone. Moreover, Andrews's description ignores the fact that he contacted her multiple times in 2009. Further, while it is true that Ivie did not receive email or text messages from Andrews from January 2010 until November 2010, the evidence shows that Ivie was blocking his email and phone messages during that time.

We conclude that Andrews engaged in a knowing or an intentional course of conduct involving repeated or continuing

---

1. The definition of "repeated or continuing" in the stalking context has recently been addressed by this Court in *Nicholson v. State*, 948 N.E.2d 820 (Ind.Ct.App.2011), *vacated.* Our Supreme Court granted transfer in *Nicholson* on July 20, 2011, two days after the parties completed briefing in this case, and has not yet issued an opinion. This Court's opinion in that case has no precedential value. *See* Ind. Appellate Rule 58(A) ("If transfer is granted, the opinion ... of the Court of Appeals shall be automatically vacated" except for opinions or portions thereof that are (1) expressly adopted and incorporated by reference or (2) summarily affirmed by our Supreme Court.); *Meyer v. Biedron*, 667 N.E.2d 752, 752–53 (Ind.1996) ("[O]nce transfer is granted, the Court of Appeals' opinion or judgment is vacated and held for naught." (quotation omitted)). We note only that the instant case is distinguishable from the facts in *Nicholson*, where the majority found insufficient evidence to support a stalking conviction where the charging information alleged a single threat occurring in November 2008 but other evidence showed the defendant had engaged in a pattern of similar conduct against the same victim two years earlier. 948 N.E.2d at 824. Here, Ivie's petition alleged multiple contacts and the evidence showed multiple contacts within a period of about one and a half years.

harassment of Ivie that would cause a reasonable person and did indeed cause Ivie to feel terrorized, frightened, intimidated, or threatened. There is thus sufficient evidence to support the trial court's issuance of the protective order.

*CONCLUSION*

For the reasons stated above, we affirm the order of the trial court.

Affirmed.

VAIDIK, J., and MATHIAS, J., concur.