Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Aug 12 2013, 6:56 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**YVONNE FERGUSON-WATKINS**
Ferguson-Watkins and Associates
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| TAMMY COLEMAN, | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1210-PO-793 |
| | ) | |
| DARRYL DAVIS, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Barbara Cook Crawford
Cause No. 49G21-1207-PO-30046

**August 12, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

The Marion Superior Court issued a protective in favor of Darryl Davis ("Davis") and against Tammy Coleman ("Coleman"). Coleman appeals and argues that Davis presented insufficient evidence to support the issuance of a protective order.

We affirm.

**Facts and Procedural History**

Davis and Coleman founded a church together in Marion County. At some point, Davis began confiding in Coleman about his troubled marriage, which eventually ended in divorce. At some point, Davis and Coleman, began a romantic relationship, but in April 2012, Davis decided that he had not fully recovered from his divorce and needed to end his relationship with Coleman. Coleman did not take this news well and began texting and calling Davis and his friends frequently.[1] Specifically, she started calling Davis's friends, who are also pastors, telling them that Davis's life was "in jeopardy," and that he was "back in the neighborhood," apparently referring to Davis's former life on "the streets." Id. at 15-16. Coleman even told Davis's sister, Orleethia Thompson ("Thompson"), that she would "do something to" Davis and "hurt" him. Tr. pp. 15, 68.[2]

Coleman also made an appearance at a Bible study at their common church. She did so even though Davis had asked her not attend the church anymore because she "ran

---

[1] Coleman was also angry because, according to her, she paid for the church sign, which was supposed to display both of their names, but Davis had only his name placed on the sign.

[2] Coleman complains on appeal that such statements were admitted into evidence as hearsay. However, there is no indication or allegation that she objected to this testimony at trial as hearsay, nor does she claim on appeal that the trial court committed any evidentiary error. "[A] material fact at issue may be established by hearsay evidence which is admitted without objection." Franklin Cnty. Cmty. Sch. Corp. v. Brashear, 660 N.E.2d 1081, 1084 (Ind. Ct. App. 1996) (citing Keller v. State, 560 N.E.2d 533, 534 (Ind. 1990)).

most of the women away from the church because everybody that came there thought she was out for me anyway." Id. at 16. Coleman brought the police to the church to retrieve a suitcase, two CDs, and a power cord to a CD player; however, these items were not at the church, but rather, at Davis's apartment. When Davis explained to Coleman that the telephone calls and other contact had to stop, she became upset and began to cry. At that time, Davis again expressed his reasons for no longer wanting a relationship with Coleman.

Davis eventually filed a petition for a protective order. An evidentiary hearing was held on September 6, 2012. At the hearing, Davis testified that he and Coleman "were friends and then we kinda had a little relationship." Tr. p. 11. When the trial court asked if "it became an intimate relationship," Davis responded, "Yes, ma'am." Id. at 12. Davis explained that although the two of them did not live together, Coleman spent a lot of time at his home. Davis also testified that, when the time during which the two were just friends was included, the relationship lasted almost two years. Id.

During the evidentiary hearing, Coleman attempted to introduce a record of the text messages on her cell phone from April 2012 through July 2012. Specifically, Coleman stated that she had "cell phone records – incoming and outgoing records that have been um, itemized and highlighted." Tr. p. 39. Coleman had highlighted the incoming text messages and telephone calls from Davis because "he's the one that filed the case." Id. at 40. Davis objected to the trial court reviewing Coleman's cell phone records and denied that he had sent her text messages. The trial court determined that "unless . . . there is something with it from the company that indicates this is reliable

3

information, I'm not going to be able to consider it." Id. at 46. The trial court did, however, view the text messages that were currently on Coleman's cell phone. As to those messages, the trial court observed that there was no indication that Davis initiated any text conversation or that there was "a continued relationship" between the two. Id. at 51. However, the trial court noted that there was conversation between them via text messaging. Coleman also pointed out that she had received a Mother's Day card from Davis on May 8, 2012, which was after the April 2012 breakup, and the trial court took judicial notice of the fact that Davis had given Coleman a Mother's Day card in May 2012.

Towards the end the of the hearing, the trial court questioned Coleman about the incident at the church Bible study, during which or shortly after, she had police officers intervene to retrieve some of her possessions. After observing that Coleman had been in contact with many ministers, the trial court asked her "why you didn't ask one of these ministers to intercede, get your items and pick them up and be done with it?" Tr. p. 99. Coleman responded that the ministers were afraid that Davis would retaliate against them.

At the conclusion of the evidentiary hearing, the trial court rendered its decision:

> The Court finds that Mr. Davis has shown by a preponderance of the evidence that stalking has occurred in the form of harassment of . . . him and the members of his household. The Court finds that Miss Coleman, based on her behavior, represents a credible threat to his safety in that . . . the use of police and bringing them to his church . . . and the constant phone calls . . . the Court interprets that as an intention to intimidate.

Id. at 105. The trial court issued the order of protection through September 6, 2014. Coleman now appeals.

4

## Discussion and Decision

Coleman's sole issue on appeal is whether there was sufficient evidence for the trial court to issue the protective order.[3] To obtain a protective order pursuant to the Civil Protection Order Act ("CPOA"), the petitioner must establish at least one of the statutory allegations in the petition by a preponderance of the evidence. Andrews v. Ivie, 956 N.E.2d 720, 723 (Ind. Ct. App. 2011). In determining the sufficiency of the evidence we will neither reweigh the evidence nor judge the credibility of witnesses. A.S. v. T.H., 920 N.E.2d 803, 806 (Ind. Ct. App. 2010). Rather, we will look only to the evidence and reasonable inferences supporting the trial court's judgment. Id.

Pursuant to the direction of the General Assembly, we construe CPOA "to promote the: (1) protection and safety of all victims of domestic or family violence in a fair, prompt, and effective manner; and (2) prevention of future domestic and violence." Ind. Code § 34-26-5-1. Under the CPOA:

> A person who is or has been a victim of domestic or family violence may file a petition for an order for protection against a:
> (1)     family or household member who commits an act of domestic or family violence; or
> (2)     person who has committed stalking under IC 35-45-10-5 . . . .

Ind. Code § 34-26-5-2(a)(2).

---

[3] We note that Davis did not submit an appellee's brief. When an appellee fails to submit a brief, the appellant may prevail by making a prima facie case of error. Mikel v. Johnston, 907 N.E.2d 547, 551 n.3 (Ind. Ct. App. 2009). This prima facie error rule protects this court and takes from us the burden of controverting arguments advanced for reversal, a duty which remains with the appellee. Id. But even under the prima facie error rule, we are obligated to correctly apply the law to the facts in the record in order to determine whether reversal is required. Id.

The trial court may issue or modify a protective order only upon a finding "that domestic or family violence has occurred." Ind. Code § 34-26-5-9(a); <u>Andrews</u>, 956 N.E.2d at 723.  And for purposes of the CPOA, "domestic and family violence" means:

> except for an act of self-defense, the occurrence of at least one (1) of the following acts committed by a family or household member:
> (1)      Attempting to cause, threatening to cause, or causing physical harm to another family or household member.
> (2)      Placing a family or household member in fear of physical harm.

Ind. Code § 34-6-2-34.5.  "An individual is a 'family or household member' of another person if the individual: . . . is dating or has dated the other person; [or] is engaged or was engaged in a sexual relationship with the other person. . . ."  Ind. Code § 34-6-2-44.8.

"Domestic and family violence" also includes "stalking" as that crime is defined in Indiana Code section 35-45-10-1.  <u>See</u> Ind. Code § 34-6-2-34.5; <u>Andrews</u>, 956 N.E.2d at 723.  "Stalking" is defined in the criminal code as:

> a knowing or intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened.

Ind. Code § 35-45-10-1.  And "harassment" is defined as "conduct directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotion distress."  I.C. § 35-45-10-2.

6

To obtain a protective order under the CPOA, the petitioner must establish by a preponderance of the evidence at least one of the allegations in the petition.[4] Andrews, 956 N.E.2d at 723. The trial court generally has discretion to grant protective relief according to the terms of the CPOA. Id. However, a finding by the trial court that domestic or family violence has occurred sufficient to justify the issuance of an order for protection means that the respondent represents a credible threat to the safety of the petitioner. Id. "Therefore, upon a showing of domestic or family violence by a preponderance of the evidence, the trial court *shall* grant relief necessary to bring about a cessation of the violence or the threat of violence." Id. (emphasis added).

In the present case, there was ample evidence to establish that Coleman committed "domestic violence" as defined under the CPOA. First, despite Coleman's claims to the contrary, there was evidence that she and Davis were in an intimate, romantic relationship. See Tr. p. 12. From this evidence, the trial court could conclude that Coleman was a "family or household member" of Davis, as that term is broadly defined in Indiana Code section 34-6-2-44.8 to include one who "is dating or has dated the other person" and one who "is engaged or was engaged in a sexual relationship with the other person[.]" The CPOA also defines "domestic violence" broadly to include "the occurrence of an act by the respondent 'attempting to cause, *threatening to cause*, or

---

[4] Coleman has not provided this court with a copy of the petition for a protective order. Consequently, we are uncertain as to what exactly was alleged in that petition. Still, we will address Coleman's arguments that there was insufficient evidence to establish that she committed either stalking or domestic battery.

causing physical harm' to the petitioner, or placing the petitioner 'in fear of physical harm.'" <u>A.S.</u>, 920 N.E.2d at 806 (quoting I.C. § 34-6-2-34.5) (emphasis added).

Here, Coleman told Davis's friends and fellow pastors that Davis's "life was in jeopardy." Tr. p. 15. This reasonably could be understood as a threat. Moreover, Davis testified that Coleman told his sister, Thompson, that she would "hurt" Davis. <u>Id</u>. This was corroborated by Davis's sister on direct examination by Coleman:

> [Coleman]: . . . on [Davis]'s [petition] on Incident No. 2 he said uh, that I told you that I would hurt him?
>
> [Thompson]: Yes.
>
> [Coleman]: Would you mind uh, telling me what conversation that was and what exactly I said?
> * * *
> [Thompson]: [Y]ou had contacted me because you said Darryl spoke offensively to you and he didn't want you and, and you really wouldn't continue to tolerate it. *You would honestly do something to him.*
> And I was like, well, what do you mean? Because *it sounded like a threat. . . .*
> * * *
> So you said, I did fail. I did -- I messed up, but I love him, and he doesn't want me. *And, yes, you did say you would hurt him.*

Tr. pp. 66-68 (emphasis added).

Although there was no evidence of any physical altercation between Coleman and Davis, no altercation is required by the CPOA. Instead, all that is required is that the respondent *threaten* to cause physical harm to the petitioner or place the petitioner *in fear* of physical harm. <u>A.S.</u>, 920 6 N.E.2d (citing I.C. § 34-6-2-34.5). The trial court, as the trier of fact, could reasonably conclude that Coleman threatened to cause physical harm

8

to Davis or placed Davis in fear of physical harm when she told Davis's sister that she would "hurt" him or "do something" to him.

To be sure, there are ways to "hurt" someone other than physically, such as by causing emotional or reputational harm. But this did not prevent the trial court from assessing the demeanor of the witnesses, determining their relative credibility, and deciding that it was more likely than not that Coleman's threats meant that she would *physically* harm Davis. To conclude otherwise would be to step outside our role as a reviewing court and reweigh the evidence, which we are prohibited from doing. See A.S., 920 N.E.2d at 806.

While there is ample evidence to support the trial court's decision under the domestic violence prong of the statute, there is also sufficient evidence to support the decision under the stalking prong of the statute. Coleman repeatedly contacted Davis after he ended their relationship. She also contacted his fellow pastors and implied that he had returned to a life of crime. Additionally, despite being asked to not return to the church, Coleman returned to the church in person to confront Davis about items she wanted him to return. She also threatened to "hurt" Davis. Considering this evidence, the trial court could have reasonably concluded that Davis had established by a preponderance of the evidence that Coleman engaged in a knowing course of conduct involving repeated or continuing harassment of Davis that would cause a reasonable person to feel frightened, intimidated, or threatened, and that Davis did feel frightened, intimidated or threatened.

9

## Conclusion

Under our standard of review as to the credibility of witnesses, we conclude that the evidence was sufficient to permit the trial court, acting as the trier of fact, to reasonably conclude that Coleman was a "family or household member" who threatened physical harm to Davis or placed Davis in fear of physical harm, thereby committing "domestic or family violence" under the CPOA. This was sufficient to support the trial court's decision to enter a protective order against Coleman and in favor of Davis. Accordingly, we affirm the judgment of the trial court.

Affirmed.

**MAY, J., concurs.**

**BAKER, J., dissents with opinion.**

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| TAMMY COLEMAN, | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1210-PO-793 |
| | ) | |
| DARRYL DAVIS, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

**BAKER, Judge, dissenting.**

While I respect that the purpose of the CPOA is to protect the victims of domestic violence, I do not believe that we further that purpose by issuing protective orders in situations where someone simply no longer desires to deal with the consequences of a failed relationship. Because I believe that the evidence shows that this is exactly what happened in the instant case, I dissent.

The majority spends substantial time emphasizing that under the CPOA, no physical altercation is required and that instead, all that is necessary is that the respondent threatens to physically harm the petitioner. Memo op. at 8. The majority then offers several examples of Coleman threatening to harm Davis. I think that to find any of these examples a sufficient threat under the CPOA flies in the face of the evidence that was presented to the trial court.

11

In this case, the only evidence of domestic violence consists of threats that Davis and Thompson testified Coleman made. More particularly, Davis testified that Coleman had been calling his friends in the city and saying that his life was in jeopardy: "People sayin' I'm back in the neighborhood, you know. Somebody's lookin' to kill me. . . . I'm from the streets too, but I'm not there no more." Tr. p. 15-16. Further, when Coleman had Thompson on the witness stand as a direct witness, she testified that Coleman said she "would hurt [Davis]." Id. at 68.

The most logical interpretation of the conversations that Coleman had with Davis's friends is that they had something to do with Davis's former life on "the streets." Id. at 16. And while Coleman certainly was not on her best behavior when she told Thompson that she would hurt Davis, there are other ways to hurt people besides physically as the majority acknowledges. Indeed, Coleman and Davis cofounded a church together, and Coleman was not pleased when Davis kept the church name and that his name was the only one on the church sign. Id. at 22. Certainly in this context, the most reasonable interpretation of Coleman's plan to "hurt" Davis was most likely to destroy his reputation as the pastor of the church they cofounded.

Furthermore, at the evidentiary hearing when Davis had the opportunity to speak and support his petition for a protective order, he not only once but twice maintained that he wanted Coleman to just "leave [him] alone." Tr. p. 19, 104. Davis asserted that he wanted Coleman out of his life and for her to "move on" but that he did not want to "assassinate her character." Id. Davis chose to make these and similar assertions during his closing argument when he could have been highlighting his most persuasive evidence

12

supporting his petition. These statements miss the mark, insofar as they do not portray an individual describing someone who has threatened him with physical harm or placed him in fear of physical harm, but rather, they portray someone who needed to rid himself of a proverbial thorn in the side. And Davis's actions of engaging in conversations with Coleman by text and sending her a Mother's Day card are inconsistent with having been threatened with physical harm or placed in fear by Coleman. Id. at 50, 52, 54.

It is also noteworthy that the trial court did not base its decision on the fact that Davis had been threatened with physical harm or placed in fear of physical harm.[5] Instead, the trial court concluded that because Coleman had brought police officers to Davis's church and called him constantly, she had an "intention to intimidate." Tr. p. 105. Certainly, without engaging in linguistic gymnastics, we cannot say that these actions constituted a threat of physical harm or even that Davis was placed in fear of physical harm in light of the fact that Davis reciprocated at least some of Coleman's contact and sent her a Mother's Day card.

There was also insufficient evidence to satisfy the stalking prong of the statute. Indeed, there may have been even less evidence under this prong. Stalking under the

---

[5] When the trial court rendered its decision, it stated the following:

> The Court finds that Mr. Davis has shown by a preponderance of the evidence that stalking has occurred in the form of harassment of – uh, of him and the members of his household. The Court finds that Miss Coleman, based on her behavior, represents a credible threat to his safety in that the um, the use of police and bringing them to his church uh, and the constant phone calls, uh, the Court interprets that as an intention to intimidate.

Tr. p. 105.

CPOA requires that the respondent's course of conduct actually <u>causes the victim to feel terrorized, frightened, intimidated, or threatened</u>. Ind. Code § 35-45-10-1.

In the instant case, while the trial court noted that there was no indication that Davis had initiated contact between Coleman and himself in the text messages that the court viewed, the court did acknowledge that "the two of you have a communication back and forth, it shows both of them on the same – on the same entry." Tr. p. 50. Additionally, it was Davis who initiated contact with Coleman by sending her a Mother's Day card approximately one month after ending their relationship. <u>Id.</u> at 52, 54. Moreover, Davis told the court during his closing statement: "I'm a pastor now. I live a clean life. . . . All I want her to do is leave me alone." <u>Id.</u> at 104. These are hardly the actions and words of someone who feels terrorized, frightened, intimidated, or threatened. And with all due deference, the majority offers little more than a conclusory statement that the trial court could have concluded that "Davis did feel frightened, intimidated or threatened[,]" memo op. at 9, even though the plethora of evidence suggests otherwise. Under these circumstances along with the less stringent standard of review we apply when the appellee fails to file a brief,[6] I dissent.

---

[6] See <u>State Farm Ins. v. Freeman</u>, 847 N.E.2d 1047, 1048 (Ind. Ct. App. 2006) (stating that when the appellee fails to file a brief, we will reverse if the appellant can show prima facie error).

14