**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**MICHAEL N. RED**
Morse & Bickel, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**CASANDRA L. RINGLESPAUGH**
Hollingsworth & Zivitz, P.C.
Carmel, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| J.H., | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No.  29A02-1405-PO-329 |
| | ) | |
| J.N., | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE HAMILTON SUPERIOR COURT
The Honorable Gail Z. Bardach, Judge
Cause No. 29D06-1312-PO-11346

**December 16, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

J.H. appeals the trial court's denial of his petition for an order of protection against J.N., arguing that the trial court applied an incorrect legal standard. He also argues that the trial court erred in denying his motion to dismiss and in awarding attorney's fees to J.N. We find that, while the trial court did apply an incorrect legal standard, the first part of its analysis—finding that no act of stalking occurred—is determinative. However, we conclude that the trial court erred in awarding attorney's fees to J.N., and deny her request for appellate attorney's fees. Affirmed in part and reversed in part.

FACTS[1]

J.H. and J.N. became acquainted in 2006, when J.H. frequented the restaurant owned by J.N. and her then-husband, Mario. Through his patronage of the restaurant, J.H. became friendly with J.N. On approximately October 23, 2009, J.H. was at J.N.'s restaurant and witnessed a physical altercation between J.N. and Mario, and J.H. intervened to stop the fight. Following that incident, J.N. began contacting J.H.

At first, J.N. simply communicated her desire to be friends, telling J.H. via text, "I appreciate what you have done getting Mario off me- for that u will be my hero! I appreciate your communication. I would like to get to know you better as a friend…" Ex. 1 p. 6[2] (internal grammatical and spelling errors in original). However, even then it appears that the communication was one-sided, as J.N. apologized for communicating too

---

[1] We remind counsel for both parties that, in accordance with Appellate Rule of Procedure 46(A)(6), parties are required to state the facts "in accordance with the standard of review appropriate to the judgment or order being appealed."

[2] We use the pagination provided by the appellee when quoting from text messages, not the pagination that appears at the center of the page. Each exhibit has separate pagination.

often and stated that she thought she was being "put off." Id. J.H. responded that he was "all for being friends," but he also told J.N. that he had "too many things going on," and mentioned that he did not spend time with many people. Id. at 7.

Throughout 2009 and 2010, it seems that J.H. and J.N. had a friendly relationship. The two texted each other with some frequency, and it appears that they saw each other in person in some capacity. In February 2011, J.N. told J.H. she was unhappy with the state of their relationship:

> I've been thinking about a lot going on in my life. And one is you. I invited you over because I cared about you. We finally met for drinks which was a lot of fun but you made it clear that you only wanted to "hang" that you are not looking to date. Which is fine for you but not for me because I would want more which you cannot give and I would become upset which would not be good. Ha! So with my feelings I have and with the situation the way it is I feel it is in both our interest not to "hang" out. And I think it best if you avoid my restaurant. I'll always be your friend but I can't see you because I will want mire. I'm sorry – i thought i could – but that is how I honestly feel.

Id. at 20 (internal grammatical and spelling errors in original). J.H. responded that he was sorry that J.N. felt that way, but that "its cool." Id. at 22 (internal grammatical and spelling errors in original).

During that same text exchange, J.N. referred to a physical encounter between herself and J.H.: "Was thinking in the spa today- most girls – the nice ones anyway – sleep with men who they like and would like to date. No one likes to be a one night stand . . . ." Id. (internal grammatical and spelling errors in original). J.H. told J.N. that he was sorry she felt "taken advantage of," but that he had never intended to begin a relationship.

3

Id. At this point, J.N. became angry. She asked J.H. why he flirted with her and why he let her believe that he was interested in her. J.H. told J.N. he knew many women who had one night stands and stated that, while he understood she was "disturbed by all this," he could not change it. Id. at 25. J.N. told him that he did lead her on and stated that he was a "typical guy" and called him an "ass." Id. at 26, 28. J.H. told J.N. that they had "been through this 100 times and it hasn't changed anything." Id. at 27. At trial, J.H. testified that he never had a sexual relationship with J.N.

In April 2011, J.N. asked J.H. if he would like to get together for drinks, but J.H. would not commit to a time to see her. On April 19, 2011, J.N. told him, "[s]hould you decide you want to see me – maybe an Indian's game or a vacation – let me know. I'm a great person who deserves to be with someone who values me. When you realize this let me know. Maybe I'll be around." Id. at 32. J.H. told her that he had only been interested in being friends and that he was not interested in dating her or other women at the moment. J.N. responded that she understood, but that she wished things were different and that she wanted to continue their connection and asked J.H., "you felt no connection?" Id. at 35. J.H. told her that he was in physical therapy that day and continued to be unresponsive. J.N. then stated "[y]ou know what- I'm done- I get it. You have time for everyone else a/ I deserve more/ you take care – I'll leave you alone / I am done trying." Id. at 36. (internal grammatical and spelling errors in original). It was at this point that J.H. began to ask J.N. to leave him alone. He stated:

4

What are you done from? We agreed to be friends and that was it. I have never differed from that. This is exactly why I don't do relationships . . . I am trying to be polite, but I DO not want a relationship outside of a friendship with ANYONE. Why do you think you deserve more from me?! I am who I am and I am going to stay that way. Sorry, but we have been thru this a million times. I don't want to be pressured.

Id. at 37-38 (emphasis in original). He told her, "Can we just let this be, please? This is getting invasive." Id. J.N. told J.H. that she was sorry and that it was his loss and thanked him for communicating with her. J.H. said "Ok." Id. at 39.

That same day, J.N. continued to talk to J.H., and he was unresponsive except to respond "ok." J.N. then discovered that J.H. had removed her as a Facebook friend. She became agitated stating, "Did you just delete me as a friend? So I am defriended because I try to find out what is going on. Can you respond please / I am not trying to bother you. Wow." Id. at 41-42 (internal grammatical and spelling errors in original). To this, J.H. responded, "No. Leave me alone. I am not playing this shit anymore. I don't want to talk. Nothing to talk about. I am probably going to get off facebook altogether. Borderline obsessive behavior." Id. at 42 (internal grammatical and spelling errors in original).

J.N. continued to contact J.H., although she got no response. She tried calling him and continued calling and texting although she got no answer. She continuously discussed the state of their relationship, her desire to see J.H., and her desire to be friends. On January 7, 2013, J.N. again asked J.H. to get drinks, and he replied, "Please stop, I'll let you know what I decide." Ex. 2 p. 28. J.N. replied, "we prolly wouldn't have been a

5

good match because I like to communicate & do things together getting to know a person – having fun working out together- private dances – haha but things happen for a reason. But I do consider u my hero and friend whether or not you think I'm a friend…Still up for drinks tho! Let me know when you can! . . . That is if you decide you can talk to me." Id. at 29 (internal grammatical and spelling errors in original). J.H. responded firmly that he would like J.N. to stop contacting him: "Please stop. All the texts and voicemails are either when I am in meetings of in from of my girlfriend. It's causing issues. Thank u." Id. (internal grammatical and spelling errors in original).

J.N. continued to text, call, and leave voicemails. In February 2013, J.N. texted J.H. that "You remind me of my ex haha! He would intentionally not answer or try to piss me off to agitate me – but that doesn't work, I know better . . ." Id. at 33 (internal grammatical and spelling errors in original). J.N. texted constantly, vacillating between anger about how she felt she had been treated and invitations to be friends or spend time together. Twice more, J.H. told her to stop contacting him. In September 2013, J.H. expressed fear over the continued messages: "Stop calling and texting this number. It frightens me that you cannot comprehend that I am not interested in communicating with you or have a relationship." Id. at 60. J.N. sent him pages and pages of text after being asked not to text him and receiving no response.

In addition to text messages, J.N. also called J.H. numerous times and left many voice messages. In her voice messages, J.N. consistently acknowledges that J.H. has been unresponsive, making statements such as, "I mean I know you are ignoring my texts

6

right now and maybe you're doing that so you think that I'll just like lighten up and I won't contact you anymore," and "I know you're not answering your phone or my texts." Ex. 3. p. 75-76. In one message, on September 24, 2013, J.N. openly admits to knowing that her constant communication is unwelcome: "Sorry to keep bothering you and texting you like I have been, but it's been kind of fun." Id. p. 81. J.N. continued to contact J.H. even after she had been contacted by J.H.'s attorney and knew of J.H.'s intention to seek a protective order.

On November 27, 2013, J.H. filed his Petition for Ex-Parte Civil Protection Order against J.N. in Hamilton Superior Court. On December 5, 2013, the trial court denied J.H.'s petition, finding that J.H. had failed to show that domestic violence, family violence, stalking, or a sex offense had occurred sufficient to justify the issuance of an order of protection. On December 17, 2013, J.H. filed a motion to reconsider and requested a hearing. J.N. filed a motion to dismiss the motion to reconsider, which was denied.

On April 8, 2014, the trial court held a hearing on J.H.'s motion to reconsider. Once again, the trial court determined that stalking had not occurred, because it did not believe that J.N.'s behavior "would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened." Tr. p. 76. However, the trial court also stated that part of the basis for its ruling was that it found "no evidence that she presents a credible threat to his safety, and I do not believe that there was any violence or threat of violence." Id. at 73. The trial court also granted J.N. attorney's fees. J.H. now appeals.

7

DISCUSSION AND DECISION

J.H. argues that the trial court erred when it applied an incorrect legal standard in determining that an order of protection was unwarranted. In the instant case, the trial court did not enter specific findings of fact pursuant to Indiana Trial Rule 52. In such a case, a general finding or judgment controls as to issues upon which the trial court has not expressly found. Sizemore v. H & R Farms, Inc., 638 N.E.2d 455, 457 (Ind. Ct. App. 1994). A general judgment will be affirmed upon any legal theory consistent with the evidence, and this Court neither reweighs the evidence nor determines the credibility of the witnesses. Id. When reviewing a general judgment, we presume that the trial court correctly followed the law. Id.

Under the Indiana Civil Protection Order Act, a court may enter an order for protection upon a finding that domestic violence has occurred or a person is a victim of stalking. Ind. Code § 34-26-5-2. "Stalking" is defined as "a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened." Ind. Code § 35-45-10-1. "Harassment" is defined as "conduct directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually

8

causes the victim to suffer emotional distress." I.C. § 35-45-10-2. "Impermissible contact" includes, but is not limited to, "knowingly or intentionally following or pursuing the victim." I.C. § 35-45-10-3. The petitioner seeking an order of protection bears the burden of establishing the elements by a preponderance of the evidence. Mysliwy v. Mysliwy, 953 N.E.2d 1072, 1076 (Ind. Ct. App. 2011).

Here, J.H. argues that whether J.N. presented a credible threat to his safety should not have been a factor in the trial court's analysis. J.H. maintains that, under Indiana Code section 34-26-5-2, he was not required to make a showing that J.N. presented a credible threat. We agree with J.N. that requiring a showing that J.N. presented a credible threat of violence is wholly incorrect. Rather, if the trial court finds that a petitioner has established the elements of Indiana Code section 35-45-10-1 by a preponderance of the evidence, then a respondent is deemed to be a credible threat to the safety of the petitioner. Andrews v. Ivie, 956 N.E.2d 720, 723. This does not mean that J.H. was required to show that J.N. was a credible threat to his safety as a prerequisite to obtaining an order of protection. Insofar as the trial court suggested otherwise, it was in error.

However, the trial court still found that J.H. failed to show, by a preponderance of the evidence, that J.N.'s actions would have caused "a reasonable person to feel terrorized, frightened, intimidated, or threatened," as required by Indiana Code section 35-45-10-1. Therefore, although the trial court's analysis with regard to whether J.N. presented a credible threat was in error, it still used the correct legal standard to

9

determine that stalking had not occurred. As mentioned above, when this Court reviews a general judgment, we neither reweigh the evidence, nor determine the credibility of witnesses. Sizemore, 638 N.E.2d at 457. Therefore, although we find this to be a close case and believe that the trial court could have correctly issued an order of protection, we defer to the judgment of the trial court.

J.H. also argues that the trial court erred when it denied his motion to dismiss. He maintains that the trial court had no discretion to do so. J.H. points the Court to Spencer v. Spencer, 990 N.E.2d 496 (Ind. Ct. App. 2013), in which this Court held that Indiana Code section 34-26-5-12 did not give the trial court discretion to deny a written request to dismiss a protective order. However, in Spencer, the petitioner had already been granted an order of protection, and the petitioner and respondent tendered an agreed order dismissing the order of protection, which the trial court denied. Id. at 496-97.

In the instant case, the trial court had already announced its determination to deny J.H.'s request for an order of protection in open court. J.H. filed his motion to dismiss the case on April 15, 2014, the same day that the trial court's order denying the order of protection was file-stamped by the clerk. Under these circumstances, we do not find that the trial court erred in denying J.H.'s motion to dismiss.

Finally, J.H. argues that the trial court erred in awarding J.N. attorney's fees. The trial court's decision to award attorney's fees under Indiana Code section 34–52–1–1 is subject to a multi-level review. First, the trial court's findings of facts are reviewed under the clearly erroneous standard. Second, legal conclusions regarding whether the

10

litigant's claim was frivolous, unreasonable, or groundless are reviewed de novo. <u>Dunno v. Rasmussen</u>, 980 N.E.2d 846, 851 (Ind. Ct. App. 2012). Finally, the trial court's decision to award attorney's fees and any amount thereof is reviewed for an abuse of discretion. <u>Id</u>. A trial court abuses its discretion if its decision clearly contravenes the logic and effect of the facts and circumstances or if the trial court has misinterpreted the law. <u>Id.</u> Indiana Code section 34-52-1-1(b) provides:

> (b) In any civil action, the court may award attorney's fees as part of the cost to the prevailing party, if the court finds that either party:
> (1) brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless;
> (2) continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless; or
> (3) litigated the action in bad faith.

Here, the trial court did not make a specific finding that J.H. brought or continued his action after his claim became frivolous, unreasonable, or groundless, or that he litigated in bad faith. Rather, it awarded attorney's fees because it found that "the hearing was unnecessary for the Court to conduct, and because the Respondent retained counsel only because of the motion to reconsider." Appellant's App. p. 69-70. However, we cannot say that the record in this case supports the trial court's award of attorney's fees. Based on the evidence, we cannot say that J.H. continued to litigate after his claim became frivolous, unreasonable, or groundless, or that he litigated in bad faith. We therefore reverse the court's award of attorney's fees.

For the same reasons listed above, we also deny J.N.'s request for appellate attorney's fees.

11

The judgment of the trial court is affirmed in part and reversed in part.

VAIDIK, C.J., and RILEY, J., concur.