**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Sep 24 2013, 5:40 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**SHERRY A. HARTZLER**
VanGilder & Trzynka, P.C.
Fort Wayne, Indiana

ATTORNEY FOR APPELLEE:

**STEVEN R. SHINE**
Shine & Hardin, LLP
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ANGELA R. REED, | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No. 02A03-1301-PO-23 |
| | ) | |
| SALLY L. ASHCRAFT, | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Jennifer L. DeGroote, Magistrate
Cause No. 02D01-1205-PO-1314

**September 24, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Angela R. Reed ("Reed") appeals the trial court's dismissal of the Ex Parte Order for Protection ("Protective Order") that she sought and received against Sally L. Ashcraft ("Ashcraft") on May 8, 2012. Reed raises the following two restated issues:

I. Whether the trial court's dismissal of the Protective Order for lack of sufficient evidence was in error; and

II. Whether the trial court abused its discretion when it denied Reed's motion for attorney fees.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Reed and Ashcraft were involved in a romantic relationship for eleven years, from 1997 until May 2008. During their relationship and over the course of several years, the two "looked at thousands" of prospective children available for adoption. *Tr*. at 38. In 2002, Reed legally adopted two minor children, a son, A.R. and a daughter, P.R. Ashcraft was involved in the adoption process, including participating in F.B.I. fingerprinting and one or more home studies of the couple and their residence. Ashcraft believed that the children "were ours together," even if the law did not allow for her to legally adopt them. *Id*. at 46.

Around the end of May 2008, Reed ended the relationship. Reed voluntarily continued to financially support Ashcraft for a year by providing her with separate housing, across the yard from where Reed lived, and a vehicle and insurance. Reed also agreed that Ashcraft would continue providing childcare for the children. However, the situation deteriorated, and by December 2008, the relationship between Reed and Ashcraft was strained. Reed considered the relationship volatile. According to Reed, Ashcraft would

2

refuse to leave, arrive unannounced, and telephone the house all hours of the day and night. Eventually, Reed terminated contact between Ashcraft and the children because she feared for their well-being and safety.

According to Reed, Ashcraft continued to engage in the unwanted and harassing behavior, including appearing near locations where Reed was working. Ashcraft sent cards and letters to the children on holidays and birthdays. Reed filed for and received a protective order in April 2009 that was effective through and terminated in 2011. Ashcraft continued sending the children cards and letters; however, Reed did not give them to the children.

On the afternoon of May 6, 2012, there was an encounter between Ashcraft and A.R., where the two saw each other and spoke, which led to Reed filing the Petition for Order of Protection relevant to this appeal. Her Petition specified the following incident:

> My son [A.R.] was approached by Sally Ashcraft. He was told not to tell me that they met. Sally has been told via [Protective Order] 2009 not to contact children and verbally[.]

*Appellant's App*. at 10. The trial court issued the Protective Order that same day. On May 23, 2012, Ashcraft filed a Motion to Vacate the Ex Parte Order of Protection and requested a hearing.[1]

In June 2012, approximately a month after the trial court had already issued the Protective Order, Reed filed an Addendum that alleged that other incidents of stalking had occurred "in addition to the allegations in the May 8 Petition for Order for Protection." *Id.* at

---

[1] A copy of the Protective Order is not included in the Record before us, nor is Ashcraft's Motion to Vacate Order for Protection.

14. In the Addendum, Reed alleged that Ashcraft has repeatedly, knowingly, and continuously harassed and stalked Reed and the minor children through numerous written correspondences and directly and indirectly telephoning, contacting, and communicating with Reed and the minor children.

In November 2012, the trial court held a hearing on the Protective Order. The trial court reminded the parties that the Protective Order at issue was based on the Petition originally filed on May 8, not the subsequent Addendum that alleged continued instances of what Reed considered stalking and harassment, and that the hearing was to determine whether to dismiss or continue the Protective Order.[2] The trial judge elaborated that, in her view, the trial court's task was to ferret out whether Reed was indeed fearful, or whether the Protective Order was being used as a tool to keep Ashcraft out of the children's lives. *Tr.* at 18.

With regard to the May 6 encounter between Ashcraft and A.R., Ashcraft testified that she was a passenger in a car driven by her friend, Cheryl McKinney ("McKinney"). They were out on a drive first to visit McKinney's son and then stop at garage sales. When turning around in a cul-de-sac, they saw A.R., and McKinney stopped her vehicle. Ashcraft called A.R.'s name, and he waved and walked up to the vehicle. Ashcraft and A.R. spoke briefly, and Ashcraft offered her cell phone number to A.R., but he did not take it. After asking and receiving A.R.'s permission, Ashcraft and A.R. hugged briefly; Ashcraft never left her

---

[2] The trial court stated, "[T]he Court issued the Protective Order on the basis of the one ex parte hearing and the one allegation that was contained in that Petition" . . . "and that is what this Protective Order [hearing] is about today." *Tr.* at 8-9.

4

vehicle. During their meeting, Ashcraft told A.R. that it was "up to him" if he wanted to tell his mother (Reed) about their meeting "because I knew he would get in trouble for talking to me." *Id*. at 34.

McKinney testified that, at her request, Ashcraft went for a drive with her on May 6, to talk about McKinney's boyfriend, make a visit to see McKinney's son, and stop at some garage sales. *Id*. at 190. As they were turning around the vehicle, "we saw [A.R.] standing on the corner." *Id*. at 191. McKinney said that Ashcraft and A.R. "were both shocked" to see each other. *Id*. A.R. came over to the car, Ashcraft and A.R. spoke briefly and the two hugged before McKinney and Ashcraft left. McKinney testified that A.R. did not appear frightened or nervous.

Reed testified that on the afternoon of May 6, A.R. had been out in the neighborhood playing with friends. He returned home yelling Reed's name, appearing physically excited and speaking quickly. He was asking Reed, "where's [P.R.], where's [P.R.]?" *Id*. at 182. Reed described that A.R. was upset and concerned about the well-being of his sister, P.R., who was playing in the neighborhood. Upon learning about the May 6 encounter with Ashcraft, and believing Ashcraft approached A.R. and was purposefully in the neighborhood, Reed filed the Petition for an Order for Protection, explaining that even though Ashcraft had been told via a prior protective order not to contact her (Reed) or the children, she continued to do so and posed a threat to her and the children.

Because A.R. is a minor, Reed posed an objection to requiring his in-court testimony at the hearing, filing a motion to quash the subpoena issued to him. However, the trial court

5

denied to motion to quash and allowed A.R.'s testimony, and at the hearing, A.R. described the May 6 encounter with Ashcraft. He stated that he was walking at the end of a cul-de-sac, when a car passed him, and he recognized Ashcraft. He stated that "we started a conversation," during which Ashcraft asked about his sister, P.R., and Ashcraft also told A.R. that she loved him. *Id*. at 180. She offered to give him her cell phone number, but he did not take it, explaining it would upset his mother. A.R. testified that he was not scared, but was shocked. Upon further examination, A.R. testified that it made him "a little bit" nervous that Ashcraft was in the neighborhood. In particular, he explained that he was nervous for P.R. because he did not want her to become "wound up in that mess." *Id*. at 182. He confirmed, however that he did not feel terrorized, threatened, or frightened by Ashcraft that day. *Id.* at 183.

The trial court took the matter under advisement, later issuing an order dismissing the Protective Order. That same date, the trial court separately denied Reed's request for attorney fees. Reed now appeals.

## DISCUSSION AND DECISION

### I.    Protective Order

Civil orders for protection are governed by the Civil Protection Order Act ("CPOA"). *Mysliwy v. Mysliwy*, 953 N.E.2d 1072, 1076 (Ind. Ct. App. 2011), *trans. denied.* "[T]he CPOA shall be construed to promote the: (1) protection and safety of all victims of domestic or family violence in a fair, prompt, and effective manner; and (2) prevention of future domestic and family violence." *Id*. Under the Act, a person who is or has been a victim of

6

domestic or family violence may file a petition for an order of protection against a person who has committed stalking, which is defined as "a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened." Ind. Code § 35-45-10-1, -5. The petition must include specific acts or feared acts of abuse, harassment, or disruption of the peace of the petitioner. *Garmene v. LeMasters*, 743 N.E.2d 782, 785 (Ind. Ct. App. 2001) (citing Ind. Code § 34-26-2-2). To obtain relief, the petitioner must establish at least one of the allegations in the petition by a preponderance of the evidence. *A.S. v. T.H.*, 920 N.E.2d 803, 806 (Ind. Ct. App. 2010).

Here, following a hearing, the trial court dismissed the ex parte Protective Order, finding that Reed "has not shown, by a preponderance of the evidence, that domestic or family violence, stalking, or a sex offense has occurred sufficiently to justify the issuance of an Order for Protection." *Appellant's App*. at 5. In determining the sufficiency of the evidence on appeal, we neither weigh the evidence nor resolve questions of credibility. *A.S.*, 902 N.E.2d at 806. We look only to the evidence of probative value and reasonable

7

inferences that support the trial court's judgment. [3] *Id.* In this case, where the trial court dismissed the Protective Order after a hearing and thereby effectively denied her Petition, Reed is appealing from a negative judgment; in this context, we will reverse only if it we are convinced that the evidence as a whole was such that it leads unerringly and unmistakably to a decision opposite that reached by the trial court. *See Flash v. Holtsclaw*, 789 N.E.2d 955, 959 (Ind. Ct. App. 2003) (where trial court denied motion for protective order), *trans. denied.*

Again, the specific act of "abuse, harassment, or disruption of the peace" contained in Reed's Petition was the encounter between A.R. and Ashcraft that occurred on May 6, 2012, and the trial court's decision to enter the ex parte Protective Order, issued the same day as the Petition was filed, was based on that one incident. No hearing was sought or conducted on the Addendum, nor did Reed file a separate petition or any petition to modify the Protective Order.

The evidence most favorable to the trial court's judgment to dismiss the Protective Order is that A.R. and Ashcraft encountered each other while A.R. was outside playing, and Ashcraft was driving through the area with a friend. Ashcraft called to A.R., who recognized Ashcraft and approached her vehicle. The two spoke briefly, and Ashcraft offered her cell

---

[3] We note that, in their respective briefs, Reed and Ashcraft direct us to the two-tiered standard of review that we employ "when a trial court enters findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A)." *Appellant's Br*. at 15; *Appellee's Br*. at 6 (Ashcraft stating that "the trial court made specific findings of fact and conclusions . . . in dismissing Reed's protection order[.]"). However, upon review, we find that the trial court's dismissal of the Protective Order did not consist of specific findings and conclusions, but rather was a form Order, where the trial court entered a check mark next to the statement it found appropriate, namely that "Petitioner had not shown, by a preponderance of the evidence, that domestic or family violence, stalking, or a sex offense has occurred sufficient to justify the issuance of an Order for Protection." *Appellant's App*. at 5. Thus, we find the two-tiered standard of review for specific findings to be inapplicable here.

phone number to A.R., which he declined, and she asked him about his sister, P.R. Ashcraft told A.R. that she loved him, and, upon his approval, she gave him a hug, but she never exited her vehicle. Ashcraft told A.R. it was his decision whether to tell his mother that he had seen and talked to her that day. A.R. described the encounter in similar fashion. His testimony reflected that, while he was shocked to see Ashcraft and a little uneasy about her being in the area, and specifically how his younger sister would handle any encounter she might have with Ashcraft, A.R. was not frightened, terrorized, or threatened by their meeting. *Tr.* at 180, 182, 184.

While Reed had suspicions that it was no coincidence that Ashcraft was in the area, and she testified that Ashcraft continued to contact Reed and the children, despite a prior, now expired, protective order, those other allegations of stalking or harassment were not alleged in the Petition and thus were not relevant to the trial court's initial decision to issue the Protective Order. Rather, the allegation concerning Ashcraft's actions on May 6 constituted the sole basis upon which the Protective Order was issued, and thereafter the trial court, following a hearing, made a decision as to whether that Protective Order should continue in effect or be dismissed; on appeal our task is to determine whether that latter decision to dismiss it was proper. Looking to the evidence of probative value and the

9

reasonable inferences that support the trial court's judgment, we conclude that Reed has failed to establish that the trial court's dismissal of the Protective Order was in error.[4]

## II.    Attorney Fees

Reed filed a motion for attorney fees, seeking that the trial court order Ashcraft to pay Reed's attorney fees for services provided and fees incurred relevant to her Petition for the Protective Order, which the trial court denied.[5] We review a trial court's attorney fee award for an abuse of discretion. *Dunno v. Rasmussen*, 980 N.E.2d 846, 851 (Ind. Ct. App. 2012); *see also Flash*, 789 N.E.2d at 960 (holding trial court did not abuse its discretion in awarding attorney fees to petitioner in protective order litigation). The trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before it or if the trial court has misinterpreted the law. *Dunno*, 980 N.E.2d at 851.

Indiana has consistently followed the American Rule in which both parties generally pay their own fees. *Id*. at 849. In the absence of statutory authority or an agreement between the parties to the contrary, or an equitable exception, a prevailing party has no right to recover attorney fees from the opposition. *Id.* at 850. Here, the record before us does not reveal on what statutory basis Reed relied in support of her request for attorney fees.

---

[4] Ashcraft also asserts that, in addition to the fact that Reed failed to establish her claim by a preponderance of the evidence, Reed's claim fails as a matter of law because a single incident of stalking is insufficient to uphold a finding of stalking, which requires that the conduct be "repeated or continuing." *Appellee's Br*. at 4-5. Therefore, she claims, the trial court's decision to dismiss the Protective Order was not in error. Because we resolve the matter on the basis that the trial court properly found there was insufficient evidence to continue the Protective Order, we do not reach this argument.

[5] The Chronological Case Summary indicates that on July 16, 2012, Reed had a pending motion for attorney fees that the trial court denied "at this time"; however, Reed evidently filed a second motion for attorney fees on January 7, 2013, which was denied that same date.

Initially, we observe that Indiana's CPOA, under which Reed brought her Petition, specifically includes a provision regarding an award of attorney fees; it provides that, after notice and hearing, a trial court in an order for protection may order a respondent to "pay attorney's fees" or "pay the costs and fees incurred by a petitioner in bringing the action." Ind. Code § 34-26-5-9(c)(3)(A), (F).

However, on appeal, Reed's argument that she was entitled to an award of attorney fees, and that the trial court erred by denying it, is that "Ashcraft's challenge to the Protective Order was frivolous and made primarily to harass and maliciously injure Reed" and that "Ashcraft's defense was unreasonable, groundless, and litigated in bad faith." *Appellant's Br*. at 24. Thus, although she mentions the existence of Indiana Code section 34-26-5-9, the CPOA provision, she appears to argue that the trial court erred when it failed to award attorney fees pursuant to Indiana Code section 34-52-1-1(b), also known as the General Recovery Rule. This Rule authorizes a trial court to award attorney fees to the prevailing party in a civil action if the court finds that either party:

> (1) brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless;
>
> (2) continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless; or
>
> (3) litigated the action in bad faith.

Ind. Code § 34-52-1-1(b). We have explained,

> A claim is "frivolous" if it is made primarily to harass or maliciously injure another; if counsel is unable to make a good faith and rational argument on the merits of the action; or if counsel is unable to support the action by a good faith and rational argument for extension, modification, or reversal of existing

11

law.   A claim is "unreasonable" if, based upon the totality of the circumstances, including the law and facts known at the time, no reasonable attorney would consider the claim justified or worthy of litigation.  A claim or defense is groundless if no facts exist which support the legal claim relied on and presented by the losing party.  However, an action is not groundless merely because a party loses on the merits.  Bad faith is demonstrated where the party presenting the claim is affirmatively operating with furtive design or ill will.

*Dunno*, 980 N.E.2d at 850-51 (citations omitted).

Assuming without deciding that the General Recovery Rule applies in the context of this case, the record before us does not support the conclusion that Reed was entitled to an award of attorney fees.  Indeed, finding as we do that the trial court's dismissal of the ex parte Protective Order was not in error, Ashcraft's defense to Reed's Petition was, accordingly, not frivolous and her claim was not unreasonable or groundless.  Reed has failed to establish that the trial court abused its discretion when it denied her motion for attorney fees.[6]

Affirmed.

ROBB, C.J., and RILEY, J., concur.

---

[6] We note that Ashcraft's Appellee's Brief stated the trial court issued specific findings of fact and conclusions "in . . . granting Ashcraft's Motion for Attorney Fees." *Appellee's Br.* at 6.  However, our review of the record does not reveal that Ashcraft filed a motion for attorney fees, and thus we presume that the statement was error.