

FILED

Aug 24 2016, 9:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

A. David Hutson
Natalie N. Short
Hutson Legal
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE

Lucy R. Dollens
Jacob V. Bradley
Quarles & Brady, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Brian Fuchs, <br><br> *Appellant-Respondent,* <br><br> v. <br><br> Riverbend Assisted Living, <br><br> *Appellee-Petitioner.* | August 24, 2016 <br><br> Court of Appeals Cause No. 10A01-1602-PO-501 <br><br> Appeal from the Clark Circuit Court <br><br> The Honorable William Dawkins, Magistrate <br><br> Trial Court Cause No. 10C02-1512-PO-555 |

**Barnes, Judge.**

## Case Summary

[1]     Brian Fuchs appeals the trial court's issuance of three workplace violence restraining orders on behalf of employees of Riverbend Assisted Living ("Riverbend"). We affirm.

## Issues

Fuchs raises three issues, which we consolidate and restate as whether the trial court properly issued the workplace violence restraining orders.

## Facts

Riverbend is an assisted living facility in Jeffersonville. Beginning in June 2014, Fuchs's mother was a resident at the facility. Fuchs's mother had appointed Fuchs and Cherie May as her co-attorneys in fact.

Alexa Wheeler is the executive director of Riverbend, and she oversees the operations of the facility. On February 16, 2015, Wheeler learned that Fuchs was upset and wanted to talk to her. Wheeler called Fuchs, and he was very upset and angry that his mother was missing a box of Q-tips. In the beginning of April, Wheeler received another phone call from Fuchs. He was "extremely upset" that his mother had not received a shower. Tr. p. 40. He was "screaming at the top of his lungs," and he would not stop screaming. *Id.* For the first time in her twenty-five years as an executive director, Wheeler had to hang up on a resident's family member. Fuchs called back a few minutes later and asked for the phone number of Wheeler's supervisor, which she gave to him. On August 3, 2015, Fuchs called Wheeler at 11:15 p.m. while she was asleep. Fuchs "was screaming and hollering" about his mother not getting a pain pill from Melissa Gahl, a certified nursing assistant, in a timely manner. *Id.* at 43. Fuchs threatened to "come up and take care of it." *Id.* at 66. In early August 2015, Wheeler was also approached by a resident, who asked that

Fuchs not be allowed in the dining room because he was "interrogating them" about a resident counsel meeting. *Id.* at 49. Wheeler spoke to Fuchs and reminded him that he was not supposed to talk to other residents and family members and upset them. Fuchs got six inches from Wheeler's face, screamed, "B\*\*ch," and walked away. *Id.* at 49. Fuchs's face was "blood red," and Wheeler thought he was going to push her. *Id.* at 50. According to Wheeler, four long-term employees of Riverbend have threatened to leave their employment because of Fuchs's behavior.

[5] Carrie Smith is a qualified medication assistant at Riverbend, and her job requires her to pass medications to residents and help them with their showers, laundry, and daily living activities. On July 29, 2015, Fuchs's mother asked Smith for a food tray in her room. Smith told Fuchs's mother that there would be a charge for the tray, and Fuchs's mother got "quite upset." *Id.* at 29. That evening, Fuchs started "yelling, saying, this is bulls\*\*t, I'm calling the Vice President." *Id.* at 30. Fuchs was "towering" over Smith and was in her personal space, and Smith told Fuchs to stop yelling and that she was just following the policy. *Id.* at 31. Fuchs "just kept screaming and yelling," and "there was no calming him down." *Id.* Smith walked out of the room and walked away. She was "[v]ery intimidated" by Fuchs and was "scared." *Id.* at 32. Smith now avoids Fuchs and goes the other way when she sees him because she is afraid.

[6] Angela Rice is the business office director at Riverbend. On August 4, 2015, Fuchs came to Rice's office and demanded that she stop an automatic

deduction that was being used to pay his mother's bill. Rather than sit in a chair in front of Rice's desk, Fuchs came around Rice's desk and was "literally, right on top of [her]" and "towering" over her. *Id.* at 18. Fuchs bumped Rice's chair and arm, and she had to move out of his way. Fuchs was irate, and Rice was afraid of him. She was backed into a corner and could not get away from him. Rice felt intimidated and like she was in danger.

[7] In August 2015, Riverbend's counsel sent Fuchs a letter informing him that he was no longer permitted at the facility except "for the purpose of removing [his] mother from the facility for visits within the facility's normal visiting hours . . . ." Appellee's Supplemental App. p. 10. On September 10, 2015, Riverbend personnel had an informal meeting with Fuchs. They met with the ombudsman for over two hours, but the issues were not resolved. Riverbend then filed a petition with the Indiana State Department of Health to involuntarily transfer Fuchs's mother. After a hearing, an administrative law judge determined, on November 4, 2015, that Riverbend had met its burden to "show that the Facility staff and other Facility residents are endangered by Resident A's POA, Fuchs." *Id.* at 11. However, the Facility failed to demonstrate that "the Resident's medical record has been documented, that a discharge location has been identified, and that a discharge planning meeting has been held as required." *Id.* at 12. Consequently, the ALJ denied Riverbend's transfer request. The ALJ, however, suggested an alternative option of seeking a workplace violence restraining order under Indiana Code Chapter 34-26-6 to protect Riverbend's employees.

On December 17, 2015, Riverbend filed petitions for workplace violence restraining orders against Fuchs on behalf of four employees, Wheeler, Rice, Smith, and Gahl. On December 29, 2015, Fuchs approached another employee, Sonja Lewis, as she was taking the trash outside and started screaming at her. Wheeler directed Lewis to call the police, and Fuchs was asked to leave the facility.

As of the January 2016 consolidated hearing on the petitions, Fuchs's mother no longer resided at Riverbend. The petition on behalf of Gahl was dismissed at the hearing. After the hearing, the trial court granted the workplace violence restraining orders against Fuchs on behalf of Wheeler, Rice, and Smith. The restraining orders prevented Fuchs from entering Riverbend's facility, among other things. Fuchs now appeals.

## Analysis

Fuchs argues that the trial court erred by granting Riverbend's request for the workplace violence restraining orders pursuant to Indiana Code Chapter 34-26-6. The restraining orders at issue here are similar to orders of protection issued under Indiana Code Chapter 34-26-5. In such actions, the petitioner must establish the allegations in the petition by a preponderance of the evidence. *A.S. v. T.H.*, 920 N.E.2d 803, 806 (Ind. Ct. App. 2010). In determining the sufficiency of the evidence on appeal, we neither weigh the evidence nor resolve questions of credibility. *Id.* We look only to the evidence of probative value and reasonable inferences that support the trial court's judgment. *Id.*

[11]    Indiana Code Section 34-26-6-6 provides that:

> An employer may seek a temporary restraining order or injunction on behalf of an employee to prohibit further violence or threats of violence by a person if:
>
> (1) the employee has suffered unlawful violence or a credible threat of violence from the person; and
>
> (2) the unlawful violence has been carried out at the employee's place of work or the credible threat of violence can reasonably be construed to be carried out at the employee's place of work by the person.

A "credible threat of violence" is "a knowing and willful statement or course of conduct that does not serve a legitimate purpose and that causes a reasonable person to fear for the person's safety or for the safety of the person's immediate family." Ind. Code § 34-26-6-2. The term "'unlawful violence,' except for lawful acts of self-defense or defense of others, means battery under IC 35-42-2 or stalking under IC 35-45-10." I.C. § 34-26-6-5.

[12]    The workplace violence restraining order statute, however, may not be construed to:

> (1)    permit a court to issue a temporary restraining order or an injunction that prohibits speech or any other activity that is constitutionally protected or otherwise protected by another law;
>
> (2)    prevent either party from representation by private counsel or from pro se representation; or

> (3)     expand, diminish, alter, or modify the duty, if any, of an employer to provide a safe workplace for an employee or another person.

I.C. § 34-26-6-15.

[13]     Fuchs first argues that the trial court did not have authority to issue the workplace violence restraining orders because Fuchs is his mother's attorney in fact. Fuchs relies on 410 Indiana Administrative Code Section 16.2-5-1.2(cc), which provides that "[t]he facility shall not restrict visits from the resident's legal representative . . . except at the request of the resident." "Legal representative" includes an attorney in fact. 410 Ind. Admin. Code § 16.2-1.1-34. According to Fuchs, the restraining orders violate Indiana Code Section 34-26-6-15(1) because visiting his mother as her legal representative is protected by the administrative code.

[14]     Riverbend contends that we need not address the argument because Fuchs's mother no longer lives in the facility, and the argument is moot. Fuchs does not dispute that his mother no longer is a resident at the facility. We agree that, because Fuchs's mother is no longer a resident of the facility, the facility is not restricting visits from a resident's attorney in fact, and Fuchs's argument is moot. Consequently, we need not address Fuchs's contention that a resident's

attorney in fact cannot be prevented from visiting the resident by a workplace violence restraining order.[1]

[15] Next, Fuchs argues that the evidence was insufficient to grant the workplace violence restraining orders. Riverbend was required to demonstrate that its employees suffered unlawful violence or a credible threat of violence from Fuchs. I.C. § 34-26-6-6. In demonstrating that Wheeler, Rice, and Smith suffered a credible threat of violence, Riverbend was required to show that Fuchs engaged in a knowing and willful statement or course of conduct that did not serve a legitimate purpose and that caused a reasonable person to fear for the person's safety or for the safety of the person's immediate family.[2] I.C. § 34-26-6-2. According to Fuchs, the incidents were not credible threats of violence because his conduct served a legitimate purpose and because the women did not reasonably fear for their safety.

[16] We addressed a similar situation in *Torres v. Indiana Family & Soc. Servs. Admin.*, 905 N.E.2d 24 (Ind. Ct. App. 2009). There, Teresa Torres was a member of the Indiana Council on Independent Living ("ICOIL") and regularly attended its

---

[1] We further note that Fuchs was a co-attorney in fact, and the workplace violence restraining order did not prevent Fuchs's mother from meeting with her other attorney in fact.

[2] Fuchs also argues that, with respect to Rice, he did not commit battery when he bumped into her in her office. Riverbend was required to demonstrate either that Rice suffered unlawful violence or that she suffered a credible threat of violence. I.C. § 34-26-6-6. Riverbend alleged in its petition that Fuchs had made a "credible threat of violence" against Rice. Appellant's App. p. 32. Riverbend did not allege that Rice was battered by Fuchs, although it did discuss the incident in its closing argument. We conclude Riverbend presented sufficient evidence that Fuchs made a credible threat of violence against Rice. Consequently, we need not decide whether Fuchs battered Rice.

meetings. Carole Baker was a member of ICOIL and was the only FSSA employee permitted to attend. Baker and other ICOIL personnel witnessed outbursts from Torres during various ICOIL meetings. Baker and several ICOIL members heard Torres yell and curse at various attendees, and she once overturned a chair. One member witnessed Torres throw objects and engage in verbal outbursts during at least fifteen meetings. During several meetings, Baker had to have Capitol Police intervene.

[17] At a meeting on April 9, 2008, Torres complained that her assistive listening device was not working. She threw the hearing device at the table and stated, "this piece of sh*t doesn't work and I'm tired of telling you." *Torres*, 905 N.E.2d at 26. Torres stood up, continued to yell, and began pacing the room with clenched fists. At some point, Torres picked up the end of an eight-foot table and dropped it to the floor. She then threw or kicked a chair into the table to get everyone's attention. Torres screamed, "damn every one of you to hell" and "f* * * every one of you motherfu* * * *g sons of b* * * *es, I hope you all die. Do you hear me. I hope you die." *Id.* ICOIL personnel adjourned the meeting, and Torres jumped from her seat, started to yell again, and approached the table. Torres threw the listening device and charged toward Baker. Torres then leaned toward Baker and screamed: "And, you. You sit there just staring at me and not blinking. At least I don't have your disability. I'm not ugly. I just can't hear well." *Id.* Torres jerked a microphone from the table and grabbed a computer out of the hands of ICOIL's president, who is legally blind, and demanded to know who had purchased the equipment.

[18] The trial court granted the restraining order, and on appeal, we rejected Torres's argument that a reasonable person would not fear her conduct. Participants at the meetings testified that they were afraid of Torres, her conduct was increasing in intensity and severity, and police intervention was necessary on several occasions. Torres also argued that there was no "credible threat of violence" because of her mere "protests" or "advocacy" on behalf of herself and others. *Id.* at 30. We noted that "yelling, threatening, using profanity, throwing metal devices, knocking over chairs, or charging people, constitute behavior far beyond mere protestations or any type of advocacy contemplated in the workplace." *Id.* at 30. We concluded that the trial court properly entered the workplace violence restraining orders.

[19] As in *Torres*, we conclude that Fuchs's conduct qualifies as a credible threat of violence with respect to Wheeler, Rice, and Smith. Fuchs repeatedly harassed, screamed at, and intimidated Riverbend employees. Although Fuchs may have been protesting the care his mother was receiving, his behavior went far beyond advocating for his mother. Repeatedly screaming, threatening, cursing, getting in employees' faces, and backing employees into corners does not serve a legitimate purpose. Further, Rice and Smith testified that they were scared of Fuchs, and Wheeler testified that she was afraid Fuchs was going to initiate a physical altercation with her. Given Fuchs's repeated conduct, a reasonable person would fear for his or her safety. Fuchs's arguments to the contrary are merely requests that we reweigh the evidence, which we cannot do. Riverbend presented sufficient evidence to demonstrate that the employees suffered

credible threats of violence from Fuchs at their place of employment. The trial court properly entered the workplace violence restraining orders.[3]

## Conclusion

[20] The trial court properly granted the workplace violence restraining orders against Fuchs. We affirm.

[21] Affirmed.

Vaidik, C.J., and Mathias, J., concur.

---

[3] Fuchs also argues that the trial court abused its discretion by admitting written statements of Melissa Gahl and Sonia Lewis regarding their interactions with Fuchs. However, we must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties. Ind. Trial Rule 61. Riverbend presented sufficient evidence to support the granting of the restraining orders on behalf of Wheeler, Rice, and Smith without consideration of Gahl's and Lewis's statements. Any error in the admission of the statements of Gahl and Lewis is harmless.