## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 24 2020, 10:31 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Rodney T. Sarkovics
Sarkovics Law
Carmel, Indiana

## I N   T H E

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| D.W., <br> *Appellant-Respondent,* <br><br> *v.* <br><br> A.W., <br> *Appellee-Petitioner.* | March 24, 2020 <br><br> Court of Appeals Case No. 19A-PO-2451 <br><br> Appeal from the Hamilton Superior Court <br><br> The Hon. William J. Hughes, Judge <br><br> Trial Court Cause No. 29D03-1905-PO-4586 |

**Bradford, Chief Judge.**

# Case Summary

[1] D.W. and A.W., father and son, respectively, used to practice dentistry together but ceased doing so in around 2012. After that, A.W. continued to rent space from D.W.'s LLC. In around 2018, D.W.'s license to practice was suspended, and a business dispute arose between him and A.W. which caused A.W. to stop paying rent. In April of 2019, A.W. filed a civil lawsuit against D.W.

[2] Following the filing of the lawsuit, D.W. left nine voicemail messages for A.W. in the next seventeen days. In the voicemails, D.W. indicated repeatedly that he had information that he planned to provide to authorities that would result in criminal charges against A.W. and the loss of his business, his professional license, and even his family if A.W. did not meet with him personally to settle the business dispute. On May 14, 2019, D.W. went uninvited to A.W.'s house and banged on the door, causing A.W.'s visibly frightened wife to take their children upstairs. D.W. sat in the driveway and did not leave until police arrived and told him to.

[3] The next day, A.W. petitioned for an order of protection against D.W. Following a hearing, the trial court granted A.W.'s petition and denied D.W.'s motion to correct error. D.W. contends that the trial court abused its discretion in denying his motion to correct error because it had earlier clearly erred in granting A.W.'s petition for an order of protection. Because we disagree, we affirm.

# Facts and Procedural History

[4] D.W. is A.W.'s father, and A.W. began practicing dentistry in D.W.'s offices in 2007. By around 2012, the two had decided that they could no longer practice together. Despite no longer practicing with D.W., A.W. apparently continued to rent office space from an LLC managed by D.W. At some point around or before late 2018, D.W.'s license to practice was suspended, and a business dispute arose between A.W. and D.W. which involved, *inter alia*, A.W. ceasing his rent payments for his office space. Meanwhile, in November of 2018, D.W. began leaving voicemails with A.W. related to the business and financial dispute. All told, A.W. recorded twenty-three voicemails that were left between November 12, 2018, and May 10, 2019. There is no indication that A.W. returned any of D.W.'s telephone calls or responded to them in any other way. On April 23, 2019, A.W. filed suit against D.W., a suit related to their business dispute.

[5] After the lawsuit was filed, the frequency of the voicemail messages increased, and the content, which previously had been almost entirely related to the business dispute, changed. On April 24, 2019, D.W. left a voicemail indicating that he had been served with A.W.'s lawsuit and said, *inter alia*, "I am filing some new charges against you and Nicole in Muncie at the police department [… that] could end up in felony charges so that [you] would lose your license." Appellant's App. Vol. II p. 113–14. On April 26, D.W. left a message indicating that A.W. might be facing theft, burglary, and mail-tampering charges. D.W. also indicated that he would be bringing up "[a]ll this personal stuff […] from day one you're born" and "I'm just saying this is what I got to

do to survive[.]" Appellant's App. Vol. II p. 114. On April 29, D.W. left a message indicating that he had information that could lead to "potential tax fraud, tax evasion stuff […] and those are serious, serious charges" and that he was "loaded with a lot of bad, bad information." Appellant's App. Vol. II p. 115. On April 30, D.W. left a message that we believe is worth excerpting at length:

> But I also have evidence, [A.W.], that you have committed insurance fraud, potentially insurance fraud. Not proven, but could be easily proven, proven, and also you—tax evasion. Tax evasion and that, that results into serious stuff. That's, that's automatic—if all those things go against your record, especially insurance fraud and tax evasion, you automatically lose your license. So, you're gonna, you're heading in the wrong direction. I wouldn't call and say this if I didn't really care. I do care about what you're doing, about your future and care about your family. But I think you're going to lose your family, and you're gonna lose an awful lot here. You've got a good 15, 20 years or so of practicing and a good profession, and you're not listening to the right people.

Appellant's App. Vol. II p. 116. On May 10, D.W. left a message in which he told A.W. that he had "some information here, it's very serious, about the possibility of losing your license. I have all the evidence" and that "you're gonna have to, have to make a decision here because I'll have to do what I have to do." Appellant's App. Vol. II pp. 117–18.

[6] On or about May 14, 2019, D.W. visited A.W.'s house and would not "stop banging on the door[,]" causing A.W.'s wife to be visibly scared and take the children, aged eight and eleven, upstairs. Tr. Vol. II p. 14. A.W. attempted to have his mother, who was still married to D.W., contact D.W. to convince him

to leave, but D.W. remained in the driveway of A.W.'s home, claiming later that his wife had not called him. Eventually, police were contacted, and they asked D.W. to leave, which he did without incident. When police asked A.W. if he wanted to "file a trespassing[,]" he declined to do so. Tr. Vol. II p. 15. A.W. described the incident as follows: "I don't know that it [was] a physical threat, but it certainly was threatening." Tr. Vol. II p. 14–15.

[7] On May 15, 2019, A.W. petitioned for an order of protection against D.W., alleging that D.W. had committed stalking against him and had placed him in fear of physical harm. A hearing on A.W.'s petition was held on May 29, 2019, during which A.W. testified that he had become concerned about D.W.'s stability and had recently told his mother that he thought about D.W. when he set his house alarm at night. In A.W.'s view, the telephone messages left by D.W. had become increasingly aggressive and contained threats that were meant to be bullying, which he characterized as, "'You're going to lose your family,' 'I'm going to turn you over to the IRS' or whatever this is, 'I'm going to take you to court,' 'I'm going to do this,' 'You're going to end your career,' [and] 'I'm putting you in front of the dental board[.]'" Tr. Vol. II p. 14.

[8] D.W. acknowledged at the hearing that it had been clear to him by the end of April of 2019 that A.W. did not wish to have any further communication with him. D.W. also testified that he had gone to A.W.'s house on May 14, 2019, uninvited and had knocked on the door "a couple times." Tr. Vol. II p. 53. When D.W., who represented himself at the hearing, was questioning A.W., the trial court told him, "I think you are a bully[;]" described the questioning as

"nasty[,] inappropriate[,] and bullying[;]" imposed suspended fines of $50.00 and $100.00 for improper questioning; and warned him three times that he was wasting everybody's and/or the trial court's time with his irrelevant questioning. Tr. Vol. II pp. 42, 44.

[9] The trial court ultimately found that (1) D.W.'s actions rose to the level of stalking, (2) D.W. represented a credible threat to A.W. or a member of A.W.'s family, and (3) an order of protection was necessary to bring about a cessation of violence or the threat thereof. On June 28, 2019, D.W. filed a letter with the trial court which it treated as a motion to correct error. On September 23, 2019, following a hearing, the trial court denied D.W.'s motion to correct error.

## Discussion and Decision

[10] We note that A.W. has not filed an appellee's brief in this matter, and when the appellee does not file a brief, we need not undertake the burden of developing an argument for him. *Trinity Homes, LLC v. Fang*, 848 N.E.2d 1065, 1068 (Ind. 2006). Rather, we will reverse the trial court's judgment if the appellant presents a case of *prima facie* error. *Id.* "Prima facie error in this context is defined as, at first sight, on first appearance, or on the face of it." *Id.* (quotation omitted). Where an appellant does not meet this burden, we will affirm. *Id.*

[11] That said, D.W. appeals from the denial of his motion to correct error, and "[t]he standard of appellate review of trial court rulings on motions to correct error is abuse of discretion." *Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048, 1055 (Ind. 2003). D.W. argues that the trial court abused its discretion in denying his motion to correct error because A.W. had failed to present

sufficient evidence to sustain the order of protection issued by the trial court. "[I]n granting a protective order the trial court must *sua sponte* make special findings of fact and conclusions thereon." *Hanauer v. Hanauer*, 981 N.E.2d 147, 148 (Ind. Ct. App. 2013). We apply a two-tiered standard of review to these findings and conclusions:

> [F]irst, we determine whether the evidence supports the findings, and second, whether the findings support the [order]. In deference to the trial court's proximity to the issues, we disturb the [order] only where there is no evidence supporting the findings or the findings fail to support the [order]. We do not reweigh the evidence, but consider only the evidence favorable to the … [order]. Those appealing the … [order] must establish that the findings are clearly erroneous. Findings are clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made. We do not defer to conclusions of law, however, and evaluate them *de novo*.

*Id*. at 149 (bracketed and omitted material in *Hanauer*). In reviewing the sufficiency of the evidence to support an order for protection, we neither reweigh the evidence nor judge the credibility of witnesses. *A.S. v. T.H.*, 920 N.E.2d 803, 806 (Ind. Ct. App. 2010). We consider only the probative evidence and reasonable inferences supporting the trial court's judgment. *Id.*

[12] A.W. requested relief pursuant to the Indiana Civil Protection Order Act ("CPOA"), codified at Indiana Code chapter 34-26-5. Under the CPOA, "[a] person who is or has been a victim of domestic or family violence may file a petition for an order for protection against a […] family or household member who commits an act of domestic or family violence[.]" Ind. Code § 34-26-5-2(a)(1). Pursuant to Indiana Code section 34-6-2-34.5, the definition of

"domestic or family violence" includes stalking as defined in Indiana Code section 35-45-10-1, which is "a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened."

> A finding that domestic or family violence or harassment has occurred sufficient to justify the issuance of an order under this section means that a respondent represents a credible threat to the safety of a petitioner or a member of a petitioner's household. Upon a showing of domestic or family violence or harassment by a preponderance of the evidence, the court shall grant relief necessary to bring about a cessation of the violence or the threat of violence.

Ind. Code § 34-26-5-9(g).

[13] Although we acknowledge that the record contains no incidents or explicit threats of violence, we nonetheless conclude that D.W. has failed to establish that the trial court clearly erred in granting A.W.'s petition for an order of protection. Although D.W.'s voicemail messages came sporadically at first, and while those messages can accurately be characterized as being almost entirely about the business dispute with A.W., that changed after A.W. filed suit on April 23, 2019. At this point, D.W. engaged in repeated acts that we believe would cause a reasonable person to feel, at the very least, intimidated or threatened.

[14] Whereas D.W. had left fourteen voicemail messages in the approximately five months preceding A.W.'s filing, he left nine in the seventeen days immediately

afterwards. More importantly, the content of the messages changed dramatically, with D.W. making multiple threats to provide authorities with information that he claimed would lead to criminal charges against A.W., which would, in turn, lead to the loss of A.W.'s dentistry license and, perhaps, his practice and his family. D.W. also indicated that he might not stop there, claiming "I'll have to do what I have to do." Appellant's App. Vol. II p. 118. All of this supports a reasonable inference that D.W. was attempting to intimidate A.W. into dropping his lawsuit.

[15] The incident, however, that finally prompted A.W. to seek an order of protection was when D.W.—uninvited and aware that he was not welcome—came over to A.W.'s house on May 14, 2019, "banging" on the door and then waiting in the driveway until being asked to leave by police. Tr. Vol. II p. 14. The incident visibly frightened A.W.'s wife, who took the couple's children upstairs. Moreover, A.W. testified that D.W.'s problems with the IRS, the dental board, the Indiana Attorney General's Office, and his family led him to be concerned about D.W.'s stability and that he had told his mother that D.W. was on his mind when he armed his home's security system at night. It is worth noting that the trial court was able to observe D.W. in court and evaluate his demeanor, finding him to be a "bully" and repeatedly chastising and sanctioning him for his improper questioning of A.W. In summary, the trial court heard evidence detailing a pattern of increasingly-aggressive behavior which culminated in the unwanted visit to A.W.'s home. Given this evidence, and the trial court's observation of D.W.'s improper and bullying behavior at

the hearing, we cannot say that it was unreasonable as a matter of law for it to conclude that he represented at least the threat of violence.

[16] The judgment of the trial court is affirmed.


Robb, J., and Altice, J., concur.