## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 10 2018, 8:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Ryan P. Dillon
Maritza K. Webb
Dillon Legal Group, P.C.
Franklin, Indiana

ATTORNEY FOR APPELLEE

Glen E. Koch II
Boren, Oliver & Coffey, LLP
Martinsville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

J.D.,

*Appellant-Respondent,*

v.

E.B.,

*Appellee-Petitioner.*

January 10, 2018

Court of Appeals Case No.
55A01-1708-PO-1975

Appeal from the Morgan Superior Court

The Hon. Sara Dungan, Judge

Trial Court Cause No.
55D01-1609-PO-1415

**Bradford, Judge.**

# Case Summary

Appellant-Respondent J.D. and Appellee-Petitioner E.B. have been neighbors for approximately eight years, and for much of that time have been in conflict. Beginning in 2011 and continuing into 2017, J.D. would yell profanities at E.B. across their property line, stare and scream at E.B. as he gardened, follow E.B. as he tended to his livestock, and/or make a fist that he would punch into the palm of his other hand. J.D. sent E.B. text messages in which he called him names and used profanity. Once, J.D. told E.B.'s grandson in E.B.'s presence that his wished that E.B. was dead so that he could urinate on his grave. A friend of E.B.'s testified that he witnessed J.D. several times stomping and shouting along the fence line in an attempt to provoke E.B. J.D. yelled at E.B. and his daughter, calling them "white trash." On several occasions, J.D. recognized E.B.'s vehicle and pursued E.B. when he encountered him away from his property. In 2016, E.B. sought and, following a hearing, received an order of protection against J.D. J.D. contends that insufficient evidence supports the trial court's issuance of the protective order. Because we disagree, we affirm.

# Facts and Procedural History

E.B. is eighty-three years old and has lived at his five-acre property at 5168 East Landersdale Road in Mooresville, Indiana, for the last 47 years. J.D. lives directly to the east of E.B. and has for approximately eight years. When J.D. first moved there, E.B. and J.D. would socialize at cookouts and hayrides, but,

at some point prior to 2011, their relationship soured. In July of 2011, J.D. sent text messages to E.B. threatening him with harm, calling him names, and using profanity. E.B. filed for a protective order in 2011, and it was granted. At the time, E.B. also installed video equipment to monitor his property. After the issuance of the protective order, J.D. was caught on video screaming at E.B.

[3] In May of 2015, J.D. and E.B. engaged in a yelling match outside. When E.B.'s grandson came outside to investigate, J.D. yelled at the grandson, calling him a "f*****" and "h***" and that "this didn't concern him, and that he was a piece of s*** like his grandfather." Tr. Vol. 2 p. 35. J.D. also called E.B. a "m************." Tr. Vol. 2 p. 36. J.D. told E.B.'s grandson that he could not wait for E.B. to die so that he could "p*** on his grave." Tr. Vol. 2 p. 37. E.B. was in the vicinity during the exchange between J.D. and E.B.'s grandson. Later in the summer of 2015, while E.B. was walking down to feed his animals, J.D. followed him down the fence line, screaming profanities at E.B.

[4] From the end of March to mid-June of 2016, E.B. had a family friend stay with him at his residence. Several times, the friend witnessed J.D. stomping along the fence line erratically, shouting very loudly—some of it profane, some of it just disturbing—trying to provoke E.B.

[5] On July 10, 2016, E.B. was outdoors at his home with his daughter and son-in-law. E.B. walked down to the garden near the fence line that borders J.D.'s property. J.D., who was standing in the opening of a barn, was screaming at them, yelling and calling them "white trash." Tr. Vol. 2 p. 13. J.D. walked

from the barn, stood at the fence line, and pounded his fist into his hand. On August 9, 2016, E.B. called the police after J.D. cussed and screamed at his granddaughters and "flipped them off[.]" Tr. Vol. 2 p. 76.

[6] Other behaviors occurred with some frequency, beginning in 2011 and lasting until July of 2017. Generally, J.D. would yell across the property line and "flip" E.B. off. Tr. Vol. 2 p. 85. J.D. would stand at the fence line staring and screaming at E.B. while he gardened. E.B. keeps livestock on his property and every time E.B. was outside to take care of the animals, J.D. would walk the fence, following E.B. up and down. At times, J.D. would stand outside making a fist and punching his left palm or rubbing his fist in his hand. J.D. recognized E.B.'s vehicle, and if J.D. caught E.B. away from his property, he would follow him around, "through town, … here, there." Tr. Vol. 2 p. 85. J.D. followed E.B. "constantly." Tr. Vol. 2 p. 86.

[7] E.B. petitioned for an order of protection against J.D. on September 6, 2016, and requested a hearing. The trial court issued an *ex parte* protective order on the same day. On June 21, 2017, the trial court conducted an evidentiary hearing, after which it found that J.D. was a credible threat to the safety of E.B. or a member of E.B.'s household and "[t]he Petitioner has shown, by a preponderance of the evidence, that stalking has occurred sufficient to justify the issuance of this Order." Appellant's App. Vol II p. 92. On July 25, 2017, J.D. filed a motion to correct error, which motion the trial court denied the same day.

# Discussion and Decision

[8] "The standard of appellate review of trial court rulings on motions to correct error is abuse of discretion." *Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048, 1055 (Ind. 2003). More specifically, J.D. argues that E.B. presented insufficient evidence to sustain the order of protection issued by the trial court. "[I]n granting a protective order the trial court must *sua sponte* make special findings of fact and conclusions thereon." *Hanauer v. Hanauer*, 981 N.E.2d 147, 148 (Ind. Ct. App. 2013). To these findings and conclusions we apply a two-tiered standard of review:

> [F]irst, we determine whether the evidence supports the findings, and second, whether the findings support the [order]. In deference to the trial court's proximity to the issues, we disturb the [order] only where there is no evidence supporting the findings or the findings fail to support the [order]. We do not reweigh the evidence, but consider only the evidence favorable to the … [order]. Those appealing the … [order] must establish that the findings are clearly erroneous. Findings are clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made. We do not defer to conclusions of law, however, and evaluate them *de novo*.

*Id*. at 149 (bracketed and omitted material in *Hanauer*). In reviewing the sufficiency of the evidence to support an order for protection, we neither reweigh the evidence nor judge the credibility of witnesses. *A.S. v. T.H.*, 920 N.E.2d 803, 806 (Ind. Ct. App. 2010). We consider only the probative evidence and reasonable inferences supporting the trial court's judgment. *Id.*

[9] E.B. requested and the trial court entered its order pursuant to the Civil Protection Order Act ("CPOA"), codified at Indiana Code chapter 34-26-5. Under the CPOA, "[a] person who is or has been a victim of domestic or family violence may file a petition for an order for protection against a … person who has committed stalking under [Indiana Code section] 35-45-10-5[.]" Ind. Code § 34-26-5-2(a).

[10] The trial court may issue or modify an order for protection only upon a finding "that domestic or family violence has occurred." Ind. Code §§ 34-26-5-9(a), -9(f). The definition of "domestic or family violence" for this purpose also includes stalking as defined in Indiana Code section 35-45-10-1, "whether or not the stalking or sex offense is committed by a family or household member." Ind. Code § 34-6-2-34.5. Thus, the CPOA authorizes issuance of an order for protection where a petitioner shows stalking occurred, regardless of who has committed it. *See Parkhurst v. Van Winkle*, 786 N.E.2d 1159, 1161–62 (Ind. Ct. App. 2003) ("[F]or purposes of CPOA, stalking … need not be committed by a family or household member to constitute 'domestic or family violence.'").

[11] E.B.'s petition for an order for protection alleged he was a victim of stalking by J.D., and the trial court's order so found. Stalking is defined as "a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened." Ind. Code § 35-45-10-1. "Harassment" in turn is defined as "conduct directed toward a victim that

includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress." Ind. Code § 35-45-10-2. "Impermissible contact" is contact that "includes but is not limited to knowingly or intentionally following or pursuing the victim." Ind. Code § 35-45-10-3.

[12] We conclude that the record here supports a finding of stalking. E.B. presented evidence demonstrating and intentional course of conduct involving repeated or continuing harassment: On many occasions beginning in 2011 and continuing until 2017, J.D. would yell profanities at E.B. across their property line, stare and scream at E.B. as he gardened, follow E.B. as he tended to his livestock, and/or make a fist that he would punch into the palm of his other hand. J.D. sent E.B. text messages in which he called him names and used profanity. In 2016, J.D. told E.B.'s grandson in E.B.'s presence that his wished E.B. dead so that he could urinate on his grave. A friend of E.B.'s testified that he witnessed J.D. several times stomping and shouting along the fence line in an attempt to provoke E.B. J.D. yelled at E.B. and his daughter, calling them "white trash." Finally, the record indicates that J.D. recognized E.B.'s vehicle and pursued E.B. when he encountered him away from his property, which is specifically mentioned by the General Assembly as the sort of "impermissible contact" that supports a finding of stalking. We conclude that this evidence is more than sufficient to establish an intentional course of conduct on J.D.'s part involving repeated or continuing harassment of E.B.

[13] Moreover, the record contains evidence that E.B. actually felt terrorized, frightened, intimidated, or threatened by J.D.'s actions. E.B. testified that he was scared of J.D. "[n]ot face to face, but my back to him, yeah, I'm afraid of [J.D.]" and that "I don't trust [J.D.]." Tr. Vol. 2 Vol. 2 p. 74. This testimony supports a finding that E.B. was actually frightened by J.D.'s actions.

[14] Finally, we have little trouble concluding that a reasonable person would feel terrorized, frightened, intimidated, and/or threatened by J.D.'s behavior. Among other things, J.D. wished that E.B. would die, screamed profanities at E.B., frequently formed a fist and punched the palm of his other hand while in E.B.'s presence, and followed E.B. around when E.B. was away from his property. Taken as a whole, we conclude that a reasonable person subjected to J.D.'s behavior toward E.B. would feel terrorized, frightened, intimidated, and/or threatened.

[15] J.D. argues that our decision in *Tisdial v. Young*, 925 N.E.2d 783 (Ind. Ct. App. 2010), requires a reversal of the trial court's decision in this case. *Tisdial*, however, is easily distinguished. In *Tisdial*, we based our decision largely on the fact that "there is no evidence Tisdial came looking for Young. To the contrary, their encounters in the Park resulted from the fact both women walked in the Park on a daily or near-daily basis, and Young verbally initiated each encounter." *Id.* at 786. Here, at the very least, the evidence most favorable to the trial court's judgment indicates that J.D. committed acts of stalking by following E.B.'s vehicle in his own when E.B. was away from this

property. In other words, this is evidence that J.D. "came looking" for E.B., rendering *Tisdial* inapplicable. J.D.'s reliance on *Tisdial* is unavailing.

[16] J.D. argues that situations involving mutual conflict between unrelated individuals is not an appropriate situation for the issuance of an order for protection. As we have explained, however, the CPOA clearly covers situations involving unrelated persons where stalking has occurred. As for evidence of mutual conflict, the trial court was under no obligation to credit any of J.D.'s evidence that the conflict was mutual and apparently did not. J.D.'s argument is nothing more than an invitation to reweigh the evidence, which we will not do. J.D. has failed to carry his burden to show that the order for protection is not supported by sufficient evidence.

[17] The judgment of the trial court is affirmed.

Robb, J., and Crone, J., concur.