## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 05 2018, 8:43 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark K. Leeman
Leeman Law Office
Logansport, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| J.G.,<br>*Appellant-Respondent,*<br><br>v.<br><br>H.H., by next friends, J.S. and G.H.,<br>*Appellees-Petitioners.* | April 5, 2018<br><br>Court of Appeals Case No.<br>09A04-1710-PO-2518<br><br>Appeal from the<br>Cass Circuit Court<br><br>The Honorable<br>Leo T. Burns, Judge<br><br>Trial Court Cause No.<br>09C01-1709-PO-97[1] |

**Kirsch, Judge.**

---

[1] We note that this cause was originally filed in Cass Superior Court under Cause No. 09D01-1709-PO-97 and, after the trial court issued the ex parte protective order at issue, the case was subsequently transferred to the Cass Circuit Court and assigned Cause No. 09C01-1709-PO-97.

[1] J.S. and G.H. (together, "Parents" or "Petitioners") filed a petition on behalf of their minor son, H.H., seeking a protection order against J.G., alleging that J.G. committed stalking of H.H. The trial court issued an ex parte order for protection and, thereafter, denied J.G.'s request for relief from the order. J.G. now appeals, raising two issues that we consolidate and restate as: whether there was sufficient evidence presented to issue a protective order.

[2] We reverse and remand.

## Facts and Procedural History

[3] On September 8, 2017, J.S. ("Mother") and G.H. ("Father") filed for and obtained an ex parte order for protection in favor of their teen-aged son, H.H., and against J.G., who the record indicates has a mild learning disability and was, at the time at issue, around forty-seven years of age. *Tr. Vol. 2* at 6. J.G. likes to play basketball. According to J.G., adults his age generally will not play with him due to his level of basketball skills, and he sometimes played at the local YMCA and local parks with teenagers, including H.H. The dates and chronology of several relevant interactions between J.G. and H.H., in the weeks leading up to the filing of the petition for the protective order, are outlined below.

[4] On August 18, 2017, H.H. got in trouble at school. That afternoon, he went to Mother's home, they argued, and he left without her permission around 4:00 p.m. When H.H. was at or near the local train trestle, he telephoned J.G. "for a ride." *Id.* at 44. J.G. arrived, but around that same time, H.H. and a friend left

in a car with some girls. Sometime later, H.H. met up with J.G. at another location, which was their plan when H.H. left in the car with the girls. Then H.H. and two friends got into J.G.'s car, and they went and played basketball at one or more community parks and a church.

[5] Meanwhile, sometime after H.H. had left Mother's home that afternoon, she called the police to report the situation of H.H. leaving home, as she believed he was possibly running away. Lieutenant Shonn Parmeter of the Logansport Police Department, who was at that time H.H.'s baseball coach and thus had a personal relationship with H.H. and his family, heard the runaway report and attempted to locate H.H. Officer Parmeter was advised that H.H. might be with J.G., who Officer Parmeter did not know, and he began investigating J.G., such as where he lived and the car he drove.

[6] At some point after playing basketball at a park with J.G. and others, H.H. left on foot with some friends, and, around 10:00 p.m., another officer with the Logansport Police Department saw H.H. walking on a bridge, stopped his vehicle, and picked up H.H. Officer Parmeter arrived on the scene and drove H.H. home. During the ride home, H.H. told Officer Parmeter that he had argued with his Mother and left home without permission and that J.G., an adult acquaintance who he knew through the YMCA and playing basketball, had picked him up. H.H. told Officer Parmeter that J.G. regularly would transport him and his friends "around town" in J.G.'s car. *Id.* at 34. After dropping off H.H. at home, Officer Parmeter talked to Mother about what H.H. had said in the car, including his acquaintance with J.G. and J.G.'s age.

Mother told H.H. not to hang around with J.G. anymore. Mother stayed in communication with Officer Parmeter after that night, and at some point, she conveyed that there was "an ongoing issue with [J.G.,]" and she asked Officer Parmeter to convey to J.G. to stay away from H.H.

[7] On August 24, J.G. went to Fairview Park and was waiting for a possible pick-up basketball game. H.H. and his friends were also there at the time. At some point, H.H.'s Mother arrived and confronted J.G. and told him not to be around H.H. J.G. walked away, got in his car, and left. The next day, J.G. learned from his father, with whom he lived, that H.H.'s father had been to their home the day before and said that he did not want J.G. to be around H.H. Some days later, on or around August 29, J.G. went to Fairview Park in the evening to see if anyone was playing basketball. It was dark outside, but there were lighted courts at the park. He arrived and went to the pavilion area, and he saw H.H.'s friends, who said that H.H. was there and that Father was on his way to pick up H.H. The friends told J.G. that he should not be around H.H., so J.G. left and went home. When J.G. got home, Father was there, and he told J.G. to stay away from H.H.

[8] A day or two later, on or around September 1, the Director of the local YMCA, who was a friend of Officer Parmeter, contacted police to advise that J.G. was at the facility. Officer Parmeter went to the YMCA, saw J.G. by the door, and asked for his identification, which J.G. produced. Officer Parmeter told J.G. that H.H.'s parents did not want him around their son, H.H., and that he was

to have no further contact with H.H. J.G. indicated to Officer Parmeter that he understood.

[9] On September 8, 2017, Parents, acting pro se and on behalf of H.H., filed in the Cass Superior Court ("the trial court") a Petition for an Order for Protection and Request for a Hearing ("the Petition"), seeking an order of protection against J.G. *Appellant's App. Vol. II* at 8-14. The Petition alleged, in pertinent part, that J.G. "has committed the act of stalking against [H.H.] who needs protection." *Id*. at 8. The specified incidents alleged were the interactions occurring in August when (1) H.H. argued with Mother, left home, rode around with J.G. and others, and, Petitioners alleged, J.G. offered to give H.H. a phone; (2) J.G. came to Fairview Park, was told to leave by H.H.'s friends, but remained another 10-15 minutes, until Mother arrived and told J.G. to leave; and (3) J.G. "approached [H.H.] again" some days later at the park, when J.G., who was wearing a black jacket and hoodie, walked up to H.H. and his friends, they told him to leave, and J.G. said "no" initially, but then walked away. *Id*. at 10, 22, 23.

[10] On the same day that the Petition was filed, the trial court issued an Ex Parte Order for Protection against J.G. ("the Protective Order"). *Id*. at 26-27. The Protective Order included the following findings:

> a. The Petitioner has shown, by a preponderance of the evidence, that domestic or family violence or stalking has occurred sufficient to justify the issuance of this Order.

b. This [O]rder does not protect an intimate partner or child.

c. The Respondent represents a credible threat to the safety of the Petitioner or a member of the Petitioner's household.

d. The following relief is necessary to bring about a cessation of the violence or the threat of violence.

*Id.* at 26. The Protective Order (1) "enjoined [J.G.] from threatening to commit or committing acts of domestic or family violence or stalking against [H.H.]" and designated family or household members, and (2) "prohibited [J.G.] from harassing, annoying, telephoning, contacting, or directly or indirectly communicating with [H.H.]" *Id*. The terms of the Protective Order extended for two years, to expire on September 8, 2019, and notified J.G. that he had the right to request a hearing.

[11] On September 11, 2017, J.G. filed a pro se objection to the Protective Order and requested a hearing on the matter, advising that his attorney was out of town. *Id*. at 32. The case was transferred to Cass Circuit Court ("the juvenile court") because under local county rule, the circuit court should hold the hearing since the Petition involved a juvenile. *Id*. at 33. On October 6, 2017, the juvenile court held a hearing on J.G.'s request for relief from the Protective Order; J.G. appeared in person and with counsel, and Parents appeared pro se.

[12] J.G. testified that, on August 18, H.H. called him to meet at "the train trestle," and that he went there, but when he arrived, H.H. was leaving with some girls in a car. *Tr. Vol. 2* at 7. J.G. said that H.H. called him again a little while later

and said that he needed to be picked up, so J.G. picked up H.H. and two other friends and drove them to Fairview Park, where they sat in the pavilion for a while, then went in J.G.'s car to Riverside Park, where they played some basketball. After a while, H.H. and a friend left, walking away with girls. J.G. drove home. He recalled that some of H.H.'s friends called him to report that police had picked up H.H. and drove him home. J.G. testified that, on or around August 24, he went to Fairview Park and was "sitting down waiting for a game" of basketball, when H.H.'s mom came up and was "yelling" at him and saying that he was not to be around H.H. *Id.* at 14, 16. J.G. stated that, at that point, he "walked away[,]" got in his car, and left. *Id.* at 16. J.G. said that, on August 29, he went to Fairview Park around 8:30 or 8:45 p.m., to see if anybody was playing basketball, and he walked to the pavilion. He saw H.H.'s friends, who told him he should not be around H.H., and then he saw H.H, but "when I saw that H.H. was there, I walked way" and did not talk to him. *Id.* at 30. When J.G. arrived home, Father was "at [his] door," and Father told J.G., "[S]tay away from my son." *Id.* at 18. J.G. testified that Father called him "stupid," and J.G. believed Father was going to hit him. *Id.* at 19.

[13]    J.G. testified that he had had no interactions with H.H. or Parents since August 29. J.G. testified that he never tried to harass H.H. or make him feel terrorized, frightened, intimidated, or threatened, and he stated that he never offered to buy H.H. a cell phone. He also testified that he has never committed, been convicted of, nor charged with, a sex offense.

[14]    Mother and Father presented the testimony of Officer Parmeter and H.H. Officer Parmeter stated that, at Mother's request, he attempted to contact J.G. by phone on August 31 or September 1, but J.G. hung up the phone when Officer Parmeter called. At some point, Officer Parmeter spoke to the YMCA director, who shared that J.G. came to the YMCA quite frequently "and hangs out with [a] group of boys" that included H.H. *Id.* at 36. After learning that J.G. was present at the YMCA on September 1, Officer Parmeter went there, spoke to J.G., and told J.G. to stay away from H.H. When Officer Parmeter was asked on direct examination if he had concerns about the situation or relationship between J.G. and H.H., Officer Parmeter stated that the incidents that had been reported to him, such as J.G. driving around the teenagers, taking them to meals, and playing basketball with them, "appear to be grooming [techniques]" that he has seen in his experience when working in the juvenile division. *Id.* at 38. On cross-examination, Officer Parmeter acknowledged that he did not know if J.G. had a criminal history, as he had only checked for warrants and driving status.

[15]    H.H., who was fifteen years old at the time of the hearing, testified that, prior to August 18, his parents were not aware of his friendship with J.G., and, he stated, it was after he got the ride home from police on August 18 that he learned of J.G.'s age. H.H. testified that, after he got in trouble at school, his parents took away his cell phone, as discipline, and that J.G. offered to get him a new one. H.H. testified that on August 24, when Mother came to Fairview Park and confronted J.G., H.H.'s friends had already told J.G., who was sitting

on a bench, that he was not to be around H.H. and that he needed to leave the park. H.H. testified that J.G. did not say anything to him that day. *Id.* at 56. With regard to the last encounter with J.G., which was on August 29, H.H. stated that he was at Fairview Park in the pavilion with some friends, when J.G. walked up to them "out of nowhere[,]" wearing a black hooded raincoat, one that H.H. had seen him wear before, and H.H. told him that he needed to leave, and J.G. walked away. *Id.* at 57. H.H. described one incident occurring in early August when he and J.G. were at the park playing basketball, and H.H. heard J.G. making inappropriate comments to two little boys and the boys' father got mad at J.G. J.G. testified on rebuttal that he does not recall any such event and did not know what H.H. was talking about. When H.H. was asked if he felt concerned for his own safety due to J.G. or his actions, H.H. stated that there have been times when H.H. has been at the park and "it seems like [J.G.]'s just going by there, and . . . kinda like going around to see if I am there[.]" *Id.* at 60.

[16] On the trial court's questions, H.H. stated that, on occasion, J.G. would offer to pay for food and that on two occasions, Pizza Hut and Taco Bell, J.G. bought food for H.H. and a friend or two. H.H. stated that he had never been alone in a car with J.G.

[17] At the conclusion of the hearing, J.G.'s counsel argued:

> [M]y client here, has not engaged in an act of stalking, nor has he done any of the other activ[ities] that would qualify for protective

order.  He has not committed an act of domestic or family violence, nor has he committed a sex offense.

*Id*. at 73.  Counsel urged that J.G. did not initiate contact with H.H. after he was told not to do so and did not engage in harassment.  He characterized J.G. as someone with a learning disability who frequents public parks and plays basketball.  Counsel continued,

> Judge, parents can't keep someone from going to a public park just because they don't want the[m] around their son.  And the question is, whether he was harassing their son, and he wasn't.  Uh, my client has a first amendment right, a due process right, to attend public parks at his leisure, and he can go there and he can sit on a bench, he can watch birds, he can play basketball if he wants to.  He just can't harass the child.  He hadn't harassed anybody in this case.

*Id*. at 78.  At the conclusion of the hearing, the trial court denied J.G.'s request for relief from the Protective Order, stating:

> I'm persuaded primary [sic] from the testimony of the protected person that, uh, the order of protection, uh, granted by [the trial court judge], was appropriate.  The testimony today has not convinced the court that it should be terminated.  Therefore the existing order becomes permanent.  It's in effect until September, 2019.  This is a final order.

*Id*. at 80.  J.G. now appeals.

# Discussion and Decision

[18] J.G. contends that there was insufficient evidence to support the issuance of the Protective Order against him. We note that, here, Parents did not file an appellees' brief. When an appellee fails to submit a brief, we need not undertake the burden of developing an argument on the appellee's behalf. *A.S. v. T.H.,* 920 N.E.2d 803, 805 (Ind. Ct. App. 2010). Rather, we will reverse the trial court's judgment if the appellant's brief presents a case of prima facie error. *Id.* Prima facie error in this context is defined as "at first sight, on first appearance, on the face of it." *Tisdial v. Young*, 925 N.E.2d 783, 785 (Ind. Ct. App. 2010) (citing *Trinity Homes, LLC v. Fang*, 848 N.E.2d 1065, 1068 (Ind. 2006)). *Id.* When the appellant is unable to meet this burden, we will affirm. *Id.*

[19] Protective orders are in the nature of injunctions. *Hanauer v. Hanauer*, 981 N.E.2d 147, 148 (Ind. Ct. App. 2013) (citing Indian Code § 34-26-5-9(b), which authorizes the trial court to enjoin or prohibit action on the part of the respondent). Therefore, in granting a protective order the trial court must sua sponte make special findings of fact and conclusions thereon. *Id.* (citing Ind. Trial Rule 52(A) and Ind. Code § 34-26-5-9(a), (f)). We apply a two-tiered standard of review:

> [F]irst, we determine whether the evidence supports the findings, and second, whether the findings support the [order]. In deference to the trial court's proximity to the issues, we disturb the [order] only where there is no evidence supporting the findings or the findings fail to support the [order]. We do not

reweigh the evidence, but consider only the evidence favorable to the . . . . [order]. Those appealing the . . . [order] must establish that the findings are clearly erroneous. Findings are clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made. We do not defer to conclusions of law, however, and evaluate them de novo.

*Id.* at 149 (quoting *Mysliwy v. Mysliwy*, 953 N.E.3d 1072, 1076 (Ind. Ct. App. 2011), *trans. denied*).

[20] To obtain an order of protection, the petitioner must establish by a preponderance of the evidence at least one of the allegations in the petition. *A.S.*, 920 N.E.2d at 806. In determining the sufficiency of the evidence on appeal, we neither weigh the evidence nor resolve questions of credibility. *Id.* We look only to the evidence of probative value and reasonable inferences that support the trial court's judgment. *Id.*

[21] Under Indiana Code section 34-26-5-2(a), a person who is or who has been a victim of domestic or family violence may file a petition for a protective order against a:

> (1) family or household member who commits an act of domestic or family violence; or
>
> (2) person who has committed stalking under IC 35-45-10-5[.][2]

---

[2] If a child is a victim of domestic or family violence, stalking, or sex offense, a parent, guardian, or other representative may file on the child's behalf. Ind. Code § 34-26-5-2(b).

Ind. Code § 34-26-5-2(a). "Domestic or family violence" for this purpose includes stalking. Ind. Code § 34-6-2-34.5; *Fox v. Bonam*, 45 N.E.3d 794, 798 (Ind. Ct. App. 2015); *Tisdial*, 925 N.E.2d at 785. "Stalk" is defined as follows:

> [A] knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened. The term does not include statutorily or constitutionally protected activity.

Ind. Code § 35-45-10-1; *A.S.*, 920 N.E.2d at 806. Indiana Code section 35-45-10-2 defines harassment as "conduct directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress." Impermissible contact "includes but is not limited to knowingly or intentionally following or pursuing the victim." Ind. Code § 35-45-10-3. "Harassment does not include statutorily or constitutionally protected activity[.]" Ind. Code § 35-45-10-2.

[22] Here, the trial court's Protective Order found as follows, in pertinent part: (1) Petitioners have shown, by a preponderance of the evidence, that . . . stalking has occurred sufficient to justify the issuance of this Order; (2) Respondent represents a credible threat to the safety of the Petitioner or a member of the Petitioner's household; and (3) the order of protection is necessary to bring about a cessation of the violence or the threat of violence. *Appellant's App. Vol.*

*II* at 26. Upon review of the record before us, we find that the findings are not supported by the evidence.

[23] For stalking to have occurred, Petitioners were required to show by a preponderance of the evidence that J.G. engaged in a knowing or intentional course of conduct that involved repeated or continuing harassment of H.H. that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually caused H.H. to feel terrorized, frightened, intimidated, or threatened. Ind. Code § 35-45-10-1. Here, the evidence presented was that, by H.H.'s own admission, he called J.G. on August 18, at least once, and asked J.G. for a ride, and he and other friends rode around with J.G. that evening and played basketball. There was no evidence that at any time J.G. telephoned H.H. or came to H.H.'s house. J.G. went to the local public park on August 24, which is the day that H.H.'s Mother confronted J.G. and told him to stay away from H.H., at which time J.G. left. J.G. went to the park again on or around August 29, but, by all accounts, he left when H.H.'s friends told him that he should not be around H.H. J.G. said that he did not speak to H.H. that night, and H.H.'s testimony did not indicate otherwise. H.H.'s father went to J.G.'s home that night and spoke to J.G., telling him to stay away from H.H. A day or so later, Officer Parmeter also told J.G., at the YMCA, that he was not to have contact with H.H. There is no evidence that J.G. had any interaction with H.H. after he saw, but did not speak to, H.H. at the park on August 29.

[24] H.H. testified that, after Parents took his phone away from him, J.G. offered to get him a replacement cell phone, which J.G. denied. There is no evidence that any cell phone was purchased or given to H.H. When H.H. was asked by the court about J.G. purchasing meals for him, H.H. stated that J.G. had purchased one or two meals for him and a couple of friends. H.H. had never been alone in J.G.'s car with him. Significantly, H.H. did not testify that he was at any time in fear of J.G. or otherwise felt terrorized, intimidated, or threatened. Rather, when H.H. was asked if he felt concerned for his own safety due to J.G. or his actions, H.H. responded that there have been times when H.H. has been at the park and "it seems like [J.G.]'s just going by there, and . . . kinda like going around to see if I am there[.]" *Tr. Vol. 2* at 60. No one testified as to any threat of violence or perceived threat of violence.

[25] We are not unsympathetic to Parents' concerns about their teen-aged son's previously-unknown association with a forty-seven-year-old man. However, based on the evidence presented and our *prima facie* standard of review, we find that the evidence is insufficient to support the trial court's findings that (1) stalking occurred, (2) J.G. represents a credible threat to H.H.'s safety or to the safety of members of his household, or (3) an order of protection was necessary to bring about a cessation of the violence or the threat of violence. Accordingly, we reverse the trial court's Protective Order issued against J.G. and remand with instructions to vacate the order.

[26] Reversed and remanded.

Baker, J., and Bradford, J., concur.